**MECO CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 91–1494.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 1992.

Decided March 9, 1993.

James V. Meath, Richmond, VA, was on the brief, for petitioner.

Nancy J. Gottfried, with whom Peter Winkler, Supervisory Atty., and Aileen A. Armstrong, Deputy Associate General Counsel, Washington, DC, were on the brief, for respondent.

Before SILBERMAN, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

MECO Corporation seeks review of, and the National Labor Relations Board seeks to enforce, an order requiring MECO to cease and desist from interfering with its employees' exercise of their statutory rights and to reinstate with backpay two employees whom MECO dismissed. MECO claims that it fired the two employees for swearing at each other during a heated argument on the factory floor. An Administrative Law Judge found that MECO had used the employees' profane verbal exchange as a pretext to fire them for having supported union organization drives. The ALJ therefore held that the discharges were discriminatory in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3). The Board affirmed the ALJ without comment. Because we find that there is not substantial evidence on the record to support the Board's findings, we grant the petition for review and deny the application for enforcement.

## I. BACKGROUND

The facts found by the ALJ are, insofar as relevant to this appeal, as follows. The Company employs approximately 785 people at its plant in Greenville, Tennessee. Between 1987 and 1990 the Oil, Chemical and Atomic Workers International Union made three unsuccessful attempts to organize the Company's employees.

Sharon Huff and Jeannie Jones were open and active Union supporters. Huff, a ten-year employee, was a member of the Union's organizing committee and in that capacity solicited employees during their lunch break to sign authorization cards for the Union. In March 1990, during the week before the Board-conducted representation election, she attended Union meetings and wore pro-union buttons and a T-shirt emblazoned with a Union slogan. Jones, an employee for eleven years, had been involved in all three Union campaigns at MECO. During the 1990 campaign she solicited fellow employees to sign Union authorization cards and handbilled for the Union at the plant entrance. Jones wore pro-union buttons at work and wore a pro-union T-shirt to work on the day of the election.

The Company was apparently well aware of the organizing activities of Jones and Huff. Supervisors had observed Jones's handbilling activities. Indeed, according to Jones, supervisor Bill Carter, although not her supervisor, approached Jones and another employee during their break to say that "he heard that the Union was starting back up again." When she and the other employee "told him that we ... had not heard that and didn't know anything about it," Carter retorted, "Well, I know that you have heard something about it," and walked away. Jones is not sure whether this conversation took place in October 1989 or October 1990. In what was surely October 1989, Huff's then-supervisor Jim Edds, knowing that Huff could hear him, told another employee that the Union had tried to organize the Company two or three times and the "Company wasn't going to tolerate it anymore" and would "find every reason in the world to get rid of the people that was [sic] working for the Union."

On November 2, 1990, Jones and Huff had a "cuss fight." It started when Jones and another employee were walking through Huff's department and Huff made a snide reference to rumors of Jones's trysts with the husbands of other employees. A nasty argument ensued. Both women later admitted to having used the word "hell." Witnesses testified that Huff and Jones used considerably rougher language—such as "bitch," "fucking bitch," and "damn lying bitch." According to MECO's human resources director, another employee told him that one of the women called the other a "motherfucking liar." In any event, the ALJ discredited the testimony of both Huff and Jones, concluding that they "used harsher language than they were able or willing to recall" and "engaged in a heated and somewhat profane verbal exchange."

Shortly after this verbal altercation, Jones told a few of her fellow employees about her run-in with Huff, and they advised her to speak with her supervisor James Ellenburg. She recounted to Ellenburg what had transpired and expressed her hope that she would not lose her job. The following week, however, after the Company had interviewed witnesses, including Huff and Jones, management decided to discharge both women for having violated Group III Rule 17 of the "Employee Guide to MECO." That rule prohibits the use of "abusive language" and provides for penalties for a first offense ranging from a written warning to discharge, "depending on [the] nature of [the] offense."

Upon the foregoing facts, the ALJ found that the Company had unlawfully fired Huff and Jones on account of their pro-union activities. Specifically, he found that MECO had used the "cuss fight" as a convenient fig leaf to conceal an otherwise naked anti-union motivation. The Board affirmed summarily.

## II. ANALYSIS

■ Under the test announced in *Wright Line*, 251 NLRB 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981), and approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), a discharge is violative of the NLRA only if the employee's protected conduct is a substantial or motivating factor for the employer's action. *See Transportation Management*, 462 U.S. at 400, 103 S.Ct. at 2473. If the General Counsel carries her burden of proving unlawful motivation, then the employer may avoid being held in violation of §§ 8(a)(1) and (3) only if it can show that "the same action would have taken place even in the absence of the protected conduct." *Wright Line*, 251 NLRB at 1089. *See generally Southwire Co. v. NLRB*, 820 F.2d 453, 459 (D.C.Cir.1987).

■ A reviewing court will not disturb the Board's findings of unlawful motive and discriminatory treatment if "they are supported by substantial evidence on the record as a whole." 29 U.S.C. § 160(f); *accord Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Pedro's Inc. v. NLRB*, 652 F.2d 1005, 1007 (D.C.Cir.1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

■ In this case, we cannot find any facts establishing a basis from which the Board could reasonably infer that the pro-union activities of Huff and Jones played any part in the Company's decision to discharge them. The ALJ held that the General Counsel met her initial burden of demonstrating that protected conduct was a motivating factor in the employer's decision based upon two key facts. First, "Huff and Jones had been visible and vocal supporters of the Union" during its campaigns to organize MECO. Second, supervisors Edds and Carter had made comments that "clearly demonstrate[d] an anti-union animus and motive on the part of the Company to rid itself at some point of union supporters."

That both women had been conspicuous supporters of the Union is not sufficient to

satisfy the first part of the *Wright Line* test, and the General Counsel does not argue that it is. The first part of the *Wright Line* test requires proof not only that the employer knew of the employee's pro-union activities, but also that the timing of the alleged reprisal was proximate to the protected activities and that there was anti-union animus "to link the factors of timing and knowledge to the improper motivation." *Pike Chevrolet*, 1991 NLRB LEXIS 1316, *13 (October 28, 1991). *Accord Vitalie Co., Inc.*, 1992 NLRB LEXIS 1286, *34 (November 3, 1992) (first part of *Wright Line* test requires showing of union activity, employer knowledge, timing, and employer animus); *Windward Auto Sales*, 1991 NLRB LEXIS 1489, *40 (December 17, 1991) (same).

We look then to the totality of the circumstances surrounding the employees' discharge, in search of substantial evidence of unlawful motivation. As for Edds' remark, it was made in October 1989, more than a year before Huff's dismissal. By the time of her discharge, Edds was not even Huff's supervisor anymore. As for Carter's comment to Jones, it adds nothing to the Company's undoubted awareness that Jones had been a Union supporter, and, like Edds' remark, it was made—or so the ALJ was willing to assume—in October 1989, more than a year before Jones's dismissal. Significantly, neither supervisor, Edds or Carter, appears to have had anything to do with either discharge. *See, e.g., Hudson, Inc.*, 275 NLRB 874, 874–75 (1985) (where supervisor "played no part in [the employer's] decision to lay off the employees," his blatantly anti-union statement to employee wearing pro-union button did not "establish the requisite element of anti-union animus"). The ALJ specifically acknowledged that "there is no showing that [Edds] played any role in [Huff's] discharge." Thus, the supervisors' remarks constitute less than substantial evidence of anti-union animus.

Moreover, the eight-month gap between the employees' last concerted activities and their discharge strongly militates against any inference of anti-union motivation. *See NLRB v. Brookshire Grocery Co.*, 837 F.2d 1336, 1341 (5th Cir.1988) ("In view of the time lapse [of six months between the protected activity and the employee's discharge], we cannot say that an inference of connection can be drawn between the two that supports a finding of anti-union motive for the discharge"); *NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 299 & n. 4 (5th Cir.1984) (six-month time lapse between job action and employee's discharge "weighs heavily against a finding" of anti-union motivation); *Irving Tanning Co.*, 273 NLRB 6, 8 (1984) (termination of "known union adherent" five months after unsuccessful organizational drive is insufficient "affirmative proof" of unlawful motive); *Thom Brown Shoes, Inc.*, 257 NLRB 264, 268 (1981) (insufficient showing of anti-union motivation where protected conduct occurred almost six months prior to discharge); *S.S. Kresge Co.*, 234 NLRB 530 (1978) (eight-month period between employee's expression of pro-union sentiment and eventual termination was too long to support § 8(a)(3) charge); *Qualitex, Inc.*, 237 NLRB 1341, 1344 (1978) (four-month gap between union defeat and pro-union employees' discharge).

The record also shows that the Company treated Huff and Jones no more harshly that it had previously treated other employees who committed the same type of infraction. The ALJ's attempts to distinguish the three such "cases" are unpersuasive. First, the ALJ noted that "shop talk" was normally tolerated at the plant. That is quite beside the point, however. The profane banter commonly known as "shop talk" is qualitatively different from a minute-long "cuss fight." Indeed, Group III Rule 17 forbids "abusive language," not profanity. Second, the ALJ asserted that in any event the three previous discharges "involved more than just employees using profanity." Yet the termination sheets of two of the employees state only one ground for their dismissal: use of abusive language in violation of Group III Rule 17. Furthermore, the cuss fight between Huff and Jones threatened to go beyond abusive language to actual violence; Jones herself

testified that if she had another run-in with Huff, "there might be a fistfight."

The Board treated this evidence of past practice as though it were relevant only to the second part of the *Wright Line* test, which concerns causation. *Accord Golden Flake Snack Foods,* 297 NLRB 594, 598 (1990). MECO's evidence of past practice was also relevant, however, to any fair appraisal of its motive under the first part of the *Wright Line* test. Indeed, the Board has previously considered the absence of disparate treatment as a factor to be weighed against the General Counsel's allegation of anti-union animus under the first step of *Wright Line. See, e.g., Irving Tanning Co.,* 273 NLRB 6, 10 & n. 17 (1984). Thus, even if the General Counsel had established all the requisite elements of the first part of *Wright Line,* MECO would have been entitled to introduce this evidence of nondiscriminatory treatment in order to rebut the General Counsel's evidence of unlawful motivation (on which she bears the burden of proof). *See Transportation Management,* 462 U.S. at 400, 103 S.Ct. at 2473.

To be sure, the discharge of Huff and Jones may strike the outsider as disproportionate to their offense. Each had worked for the Company for a long time; Jones had received one prior warning but that was some years before her discharge. "Absent a showing of anti-union motivation," however, "an employer may discharge an employee for a good reason, a bad reason, or no reason at all without running afoul of the labor laws." *Midwest Regional Joint Bd., etc. v. NLRB,* 564 F.2d 434, 440 (D.C.Cir.1977). Here the employer's decision was within such limits as it had imposed upon itself in specifying the maximum penalty under the rule that Huff and Jones violated.

### III. CONCLUSION

In sum, we do not find substantial evidence in the record to support the Board's finding of anti-union motivation. Therefore, we do not need to reach the question whether substantial evidence supported the Board's further finding that the employees would not have been discharged but for their having engaged in protected conduct. The petition for review and the Board's application for enforcement are respectively

*Granted and denied.*