Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 13, 2003      Decided July 11, 2003

No. 01-1433

ARK LAS VEGAS RESTAURANT CORPORATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

CULINARY WORKERS UNION, LOCAL 226,
LOCAL JOINT EXECUTIVE BOARD AND
BARTENDERS UNION, LOCAL 165, LOCAL JOINT EXECUTIVE BOARD,
INTERVENORS

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

*Celeste M. Wasielewski* argued the cause and filed the briefs for petitioner. *Michael A. Taylor* entered an appearance.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Michael H. Carlin*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Frederick L. Cornnell, Jr.*, Attorney. *Siobhan M. Kelly*, Attorney, entered an appearance.

Before: HENDERSON, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Ark Las Vegas Restaurant Corporation petitions for review of a decision and order of the National Labor Relations Board (NLRB) finding that Ark committed unfair labor practices by threatening, disciplining, and terminating employees for engaging in protected union activities, and by maintaining and enforcing unlawful work rules. We deny Ark's petition and enforce the Board's order in all respects except one.

I

Ark is a tenant of the New York New York Hotel and Casino, a hotel and gaming facility in Las Vegas, Nevada. Ark operates three public restaurants inside New York New York. It also runs a fast food court, is responsible for banquet functions and room service, and maintains an employee dining room open only to employees of Ark, the hotel, and one other employer. On January 2, 1997, Ark commenced around-the-clock operations seven days per week, employing about 900 persons.

Efforts at unionization began almost as soon as the company started hiring. In a letter dated March 11, 1997, thirty employees identified themselves to Ark Vice President Paul Gordon as members of the Union Volunteer Organizing Committee. The Committee stated that it had "embarked on a campaign to organize our co-workers" into the Culinary Workers Union, Local 226, and Bartenders Union, Local 165 (collectively, the "Union"). At the same time, committee

members and other employees began wearing union buttons on their work clothes. Over the next several months, Ark disciplined or terminated eight union supporters.

On September 17, 1997, the Board's General Counsel, acting on charges filed by the Union, issued a consolidated complaint alleging that Ark committed unfair labor practices in violation of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, by threatening, disciplining, and terminating employees for protected union activities. The complaint also alleged that four of Ark's work rules, published in the company's employee handbook, violated the NLRA.[1] After a seven-day hearing, an Administrative Law Judge (ALJ) sustained the charges that are the subject of this petition. With some modifications, the Board affirmed and, inter alia, ordered Ark to reinstate and to make whole the individuals it had unlawfully terminated. *Ark Las Vegas Rest. Corp.*, 335 N.L.R.B. No. 97, 2001 WL 1149038 (Sept. 25, 2001).

Ark now petitions for review. It does not contest some of the NLRB's unfair labor practice determinations, and we therefore uphold those determinations without further discussion. *See W.C. McQuaide, Inc. v. NLRB*, 133 F.3d 47, 49 (D.C. Cir. 1998); *Grondorf, Field, Black & Co. v. NLRB*, 107 F.3d 882, 885 (D.C. Cir. 1997). In Part II, we consider Ark's challenges to the Board's findings and remedial order regarding the company's adverse employment actions and threats. In Part III, we address Ark's attack on the Board's determinations regarding the company's work rules.

---

[1] All of the allegations charged violations of NLRA § 8(a)(1), which makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their rights to form, join, or assist labor organizations. 29 U.S.C. § 158(a)(1); *see id.* § 157. The allegations concerning adverse employment actions (the disciplinary sanctions and terminations) also charged violations of NLRA § 8(a)(3), which makes it an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3).

## II

Ark disputes the Board's findings that the company took unlawful adverse actions and made unlawful threats on the ground that those findings are not supported by substantial evidence. Our role in reviewing such a claim is limited. *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001). We must uphold the Board's findings as long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). In making that determination, "we ask only whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion, and in so doing we give substantial deference to the inferences drawn by the NLRB from the facts." *Antelope Valley Bus Co. v. NLRB*, 275 F.3d 1089, 1093 (D.C. Cir. 2002) (internal quotation marks omitted). Moreover, we "must accept the ALJ's credibility determinations . . . , as adopted by the Board, unless they are patently insupportable." *Tasty Baking*, 254 F.3d at 124 (internal quotation marks omitted).

After reviewing the record in detail, we conclude that substantial evidence supports each of the contested findings. In the following sections we provide only illustrative examples. We address the adverse employment actions in Part II.A, and the threats in Part II.B. In Part II.C, we address Ark's challenge to a portion of the Board's remedial order.

## A

It is well settled that an employer violates the NLRA by taking an adverse employment action in order to discourage union activity. *Tasty Baking*, 254 F.3d at 125; *see Gold Coast Rest. Corp. v. NLRB*, 995 F.2d 257, 264–65 (D.C. Cir. 1993). The central question is the employer's motivation in taking the adverse action, and in addressing that question the NLRB uses what is known as the *Wright Line* test. *See Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981); *see also NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 401–04 (1983) (approving the *Wright Line* test). Under that test, "the General Counsel is required to make a *prima facie* showing sufficient to support

5

the inference that protected [i.e., union-related] conduct was a motivating factor in the . . . adverse action." *TIC–The Industrial Co. Southeast, Inc. v. NLRB*, 126 F.3d 334, 337 (D.C. Cir. 1997) (internal quotation marks omitted). In determining whether the employer had a discriminatory motive, "the NLRB may consider such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action." *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 735 (D.C. Cir. 2000) (internal quotation marks and alteration omitted). "Once a prima facie case has been established, the burden shifts to the company to show that it would have taken the same action in the absence of the unlawful motive." *Tasty Baking*, 254 F.3d at 126.

Substantial evidence supports the NLRB's finding of a prima facie case that protected conduct was a motivating factor in all of the adverse employment actions at issue here. Each of the eight employees involved was a known union activist or sympathizer: four of the eight had signed the March 11 organizing letter, and all had worn pro-union buttons. In addition, the Board reasonably concluded that Ark harbored hostility toward the union. For example, on March 12, after asking waiter Saam Naghdi what kind of button he was wearing and being told that it was a button supporting the union, restaurant general manager Christina Flores told Naghdi: "I don't think you can wear that here. . . . I don't think they would like it." J.A. at 304–05. Ark supervisors twice threatened employee Clara Montano for wearing a union button, once saying that it "could probably cause some discomfort among co-workers" and "that that would be bad for [her]." J.A. at 82–84. And after observing line cook Randy Kiddy's union button, supervisor Don Meza told him: "That's not good. . . . That's gonna cause you problems. . . . [T]hey don't like that kind of thing around here." J.A. at 139. When Kiddy asserted his right to wear the button, Meza tore it off his shirt, threw it on the floor, and walked away laughing.[2]

[2] While Ark contests the employees' testimony concerning some of these incidents (as well as others recounted in the following

The timing of many of the adverse actions provides further support for the Board's inference of discriminatory animus. For example, supervisor Bobbie Rihel fired Sandra Jordan only minutes after Jordan refused to remove her union button. Similarly, line cook Ron Isomura's chef discharged him less than an hour after Ark supervisors had censured Isomura for distributing union literature in the employee locker room while off-duty. Cooks Jorge Aguilar and David Schafer were terminated just weeks after they began to wear pro-union buttons. Ark terminated Vertis Manuel one day after he was cited in a local newspaper article for his pro-union views. And dishwasher Jesus Serna's supervisor fired him only twelve hours after he participated in a union rally — and after the supervisor made derisive comments about Serna's participation in the rally.

There is also substantial evidence to support the Board's conclusion that Ark failed to meet its burden of showing it would have taken the contested adverse actions in the absence of an anti-union motive. For example, the Board reasonably declined to credit general manager Flores' claim that she had disciplined Naghdi for failing to keep the restaurant's salt and pepper shakers filled, since she admitted that she had personally approved Naghdi's performance of that task when he left for the day and that she did not notice that the shakers were low until hours later. Rihel's shifting explanations for terminating Jordan — first saying that work was slow and only later claiming that Jordan's performance problems and absenteeism motivated the decision — undermine Ark's nondiscriminatory explanation for that adverse action. *See Property Res. Corp. v. NLRB*, 863 F.2d 964, 967

---

paragraphs), we cannot say that any of the ALJ's credibility determinations are "patently insupportable." *See Tasty Baking*, 254 F.3d at 124. Ark does not dispute the Board's findings regarding other incidents, including the incident involving Kiddy. Ark's failure to contest those findings does not remove them from the case, however, and they remain relevant as "strong direct evidence of [petitioner's] hostility toward unionization." *NLRB v. Talsol Corp.*, 155 F.3d 785, 793–94 (6th Cir. 1998); *see U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314–15 (7th Cir. 1991) (en banc).

(D.C. Cir. 1988). Likewise, the Board reasonably disbelieved Ark's proffered explanation for Aguilar's termination, downsizing, in light of the company's initial effort — subsequently abandoned — to justify it on the grounds of nonexistent performance shortcomings. And Ark's claim that the same downsizing led to the termination of line cook Schafer, a model employee with extensive experience, is contravened by the fact that the employer kept on each of the other three line cooks doing the same work — two of whom had been hired after him.

In sum, we conclude that the Board's findings regarding discriminatory discipline and discharge are supported by substantial evidence on the record considered as a whole.

B

Ark also challenges the Board's findings that the company made unlawfully coercive statements to two employees. NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), "forbids coercive statements that threaten retaliation against employees for the exercise of their rights to organize and to participate in union activities." *Tasty Baking*, 254 F.3d at 124; *see Southwire Co. v. NLRB*, 820 F.2d 453, 457 (D.C. Cir. 1987); *supra* note 1. "An employer's statement violates the NLRA if, considering the totality of the circumstances, the statement has a reasonable tendency to coerce or to interfere with those rights." *Tasty Baking*, 254 F.3d at 124; *see Avecor, Inc. v. NLRB*, 931 F.2d 924, 931 (D.C. Cir. 1991). In reviewing the Board's determination that a statement was coercive, we "recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969).

The Board found that an Ark manager made coercive statements to Ron Isomura during an orientation session that the company conducted on March 22, 1997. As noted above, Isomura had previously been unlawfully discharged for distributing union material in Ark's employee locker room. Vice President Gordon reinstated Isomura, and when he returned

to work he was given a "mini-orientation" by supervisor Paul Savoy. Savoy told Isomura that it was the "timing" of his discharge that had been wrong, and Savoy repeatedly asked Isomura why he and the Union were "spreading propaganda about Ark." J.A. at 240. Then, pulling out one of the Union's flyers, Savoy demanded to know how Ark could pay union wages and benefits. *Id.* The NLRB reasonably concluded that, under these circumstances, Savoy's "orientation" of Isomura was an act of coercion. *See Perdue Farms, Inc., Cookin' Good Div. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998); *Southwire*, 820 F.2d at 456–57.[3]

We also uphold the Board's finding that supervisor Salvador Ortiz attempted to interfere with employee Clara Montano's right to discuss the union with her co-workers. Montano testified that Ortiz instructed her that she "was banned from talking to [her] co-workers" and "wasn't supposed to talk to anybody, not even to get their phone number or to ask them out or go to any parties with them." J.A. at 89. He refused to explain why. Although Ark disputes that Ortiz gave this instruction, the ALJ found Ortiz' denial lacking in credibility, 335 N.L.R.B. No. 97, at 18, and there is nothing unreasonable about that determination. *See Tasty Baking*, 254 F.3d at 124. The Board concluded that the more probable explanation for the instruction was that Ortiz and his fellow supervisors had seen Montano wearing her union pin and discussing the union with colleagues, and that they "wanted to see if they could stop her from further efforts to persuade fellow employees to join with her and the others." 335 N.L.R.B. No. 97, at 18. While this may not be the only possible interpretation of Ortiz' comments, we "may not reject [the Board's finding]

---

[3] The Board found that Ark further coerced Isomura during this orientation when Savoy demanded that he adhere to the company's prohibition on solicitation and distribution in the employee dining room, as well as to its no-access rules. In Part III.A below, we uphold the Board's determination that the company's rule banning solicitation and distribution was unlawful, and we therefore uphold the associated coercion charge. However, because we remand the determination regarding Ark's no-access rules, *see infra* Part III.B, we remand the coercion charge associated with those rules as well.

simply because other reasonable inferences may also be drawn." *Tasty Baking*, 254 F.3d at 125.

## C

Finally, Ark argues that the Board's reinstatement and make-whole remedy is impermissible as applied to Isomura, because the company has already made him whole: Ark contends that it voluntarily reinstated Isomura with full backpay after unlawfully discharging him, and that although it subsequently discharged him again, this time it did so for lawful — and unrelated — reasons. It is, of course, possible that Isomura is not entitled to any more relief than he has already obtained. But the Supreme Court has "long recognized the Board's normal policy of modifying its general reinstatement and backpay remedy in subsequent compliance proceedings as a means of tailoring the remedy to suit the individual circumstances of each discriminatory discharge." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984). Thus, we "leav[e] until the compliance proceedings more specific calculations as to the [relief], *if any*, due." *Id.* (emphasis added).

## III

The Board also found that several provisions of Ark's employee handbook violated NLRA § 8(a)(1). First, until it was revised in mid-March 1997, the handbook banned employees from wearing buttons, badges, or emblems, except for those issued by the company, in public areas. *See* J.A. at 970. Second, Ark banned the solicitation of employees and the distribution of literature in working areas, which "[f]or this purpose" Ark defined as including the employee dining room. *Id.* at 1000. Finally, the company required employees to report to the "property" no more than thirty minutes before beginning their shifts and to leave the "property" within thirty minutes after finishing their shifts. *Id.* at 997. It also forbade an employee from returning to the "premises, other than as a guest," without a supervisor's preauthorization. *Id.* at 998. Violation of any of these rules subjected an employee to discipline and possible termination. We consider the but-

ton and non-solicitation rules in Part III.A, and the so-called "no-access" rules in Part III.B.

### A

Ark does not dispute the NLRB's determination that the company's original ban on wearing unauthorized "buttons, badges, or emblems" in public areas violated § 8(a)(1). *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 802 n.7 (1945); *Pioneer Hotel, Inc. v. NLRB*, 182 F.3d 939, 946 (D.C. Cir. 1999). Instead, Ark claims that its rescission of the rule constituted an adequate self-remedy under the Board's decision in *Passavant Mem'l Area Hosp.*, 237 N.L.R.B. 138 (1978).

As noted above, on March 12, 1997, waiter Saam Naghdi wore a union button to work. After learning of the button's message, general manager Christina Flores gave Naghdi a written warning for violating company policy and sent him home. While professing his belief that the company's button rule was lawful, Vice President Gordon nonetheless voided Naghdi's warning, paid him for the time he missed, and rescinded the rule. Along with the employees' next paychecks, Ark distributed a revision of the employee handbook that deleted "the portion of the old policy prohibiting employees from wearing buttons, badges or emblems." J.A. at 1030. An accompanying notice stated: "The company assures you that it will not in any other manner interfere with the rights you and other employees have which are protected by the National Labor Relations Act." *Id.*

For an employer's repudiation to relieve him of liability for unlawful conduct, the repudiation must be timely, specific, and unambiguous, and — most relevant for this petition — the employer must admit wrongdoing and refrain from committing future violations. *Passavant*, 237 N.L.R.B. at 138–39; *see Sam's Club, A Division of Wal–Mart Corp. v. NLRB*, 141 F.3d 653, 661 (6th Cir. 1998); *General Indus. Employees Union, Local 42 v. NLRB*, 951 F.2d 1308, 1312 n.1 (D.C. Cir. 1991); *Holly Farms Corp.*, 311 N.L.R.B. 273, 274 (1993), *enforced*, 48 F.3d 1360 (4th Cir. 1995), *aff'd on other grounds*,

517 U.S. 392 (1996). Ark, however, never admitted wrongdoing with respect to the button policy. Although the notice that accompanied the amendment of the employee handbook stated that the company would "not in any other manner interfere" with employees' labor rights, J.A. at 1030, Vice President Gordon himself continued to insist that the original policy was legitimate, *see* J.A. at 366; Ark Br. at 5.

Moreover, the Board also reasonably found that Ark continued to enforce the unlawful restriction notwithstanding its formal rescission. This was evidenced by the threat made against Montano for wearing a union button on March 16, 1997, just days after Gordon had reinstated Naghdi and purportedly rescinded the button ban.[4] Continued enforcement was further evidenced by supervisor Rihel's demand that Sandra Jordan remove her union button on May 27. We conclude that the Board reasonably found that "the rule was never effectively repudiated by the publication/rescission of the rule and [that] there was no admission of wrongdoing, a failure which may have contributed to the continued ad hoc enforcement" of the rule despite its formal rescission. 335 N.L.R.B. No. 97, at 6.

With respect to Ark's rule barring solicitation of employees and distribution of literature in the employee dining room, the employer does not dispute the Board's declaration that it has traditionally held that an area like the dining room "is a nonwork area in which off-duty employees may distribute union literature or solicit union membership of other off-duty employees," *id.* at 7. *See* Ark Br. at 25; *see also NLRB v. Baylor Univ. Med. Ctr.*, 439 U.S. 9, 9–10 (1978) (per curiam).

---

[4] At oral argument, Ark's counsel contended that the Montano incident occurred prior to Ark's repudiation, because the company's notice to employees was delayed until the first paychecks issued after the March 12 Naghdi incident. This contention is weakened by Ark's inability to show that employees did not receive their paychecks and notice prior to March 16. The argument is, in any event, waived because it was not raised in Ark's briefs. *See Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990); *C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 883 n.1 (D.C. Cir. 1988).

12

Rather, Ark argues that it intended — and that its employees understood — that the rule only applied to soliciting or distributing materials to *on*-duty workers. The rule, however, was not so limited on its face:

> [E]mployees may not distribute literature or printed materials of any kind, sell merchandise, solicit financial contributions, or solicit for any other cause during working time.... Furthermore, employees may not distribute literature or printed material of any kind in working areas at any time. For this purpose, the Employee Cafeteria is considered a working area....

J.A. at 1000. Nor did supervisor Savoy mention this limitation when he instructed Isomura, during his mini-orientation, that he was not to distribute materials or solicit in the employee dining room. Accordingly, we uphold the Board's determination that the non-solicitation rule violated NLRA § 8(a)(1).[5]

B

Finally, Ark challenges the ALJ's determination (affirmed by the Board without comment) that the rules forbidding employees from "[r]eporting to property more than 30 minutes before a shift is to start or staying on property more than 30 minutes after a shift ends," and from "[r]eturning to the Company's premises, other than as a guest, during unscheduled hours" unless authorized by a supervisor, J.A. at 997–98, violated the NLRA. The ALJ determined that the word "premises," as well as "the word 'property' in context appear[ ] to refer to the entire hotel, casino, outside grounds, and parking lot complex." 353 N.L.R.B. No. 97, at 7. Hold-

---

[5] Ark's briefs suggest that the Board's decision regarding the non-solicitation rule was limited to its application in the employee dining room. *See* Ark Br. at 25. The NLRB clearly determined, however, that the company's rule was also unlawful as applied to off-duty workers in the employee locker room. *See* 335 N.L.R.B. No. 97, at 7. Ark does not present any argument against that determination, and we therefore uphold it without further discussion.

ing that such a broad no-access rule "seems to have little purpose in the context of [Ark's] business other than to prevent employees from communicating to each other as they change shifts," the ALJ found it to violate NLRA § 8(a)(1). *Id.* at 8. In support, the ALJ cited *Tri-County Medical Center, Inc.*, in which the Board set forth the following test for determining the legality of certain access restrictions:

> [S]uch a rule is valid only if it (1) limits access solely with respect to the interior of the plant and other working areas; (2) is clearly disseminated to all employees; and (3) applies to off-duty employees seeking access to the plant for any purpose and not just to those employees engaging in union activity.... [E]xcept where justified by business reasons, a rule which denies off-duty employees entry to parking lots, gates, and other outside non-working areas will be found invalid.

222 N.L.R.B. 1089, 1089 (1976).

Pointing to the last sentence of this quotation, counsel for the Board defends the ALJ's opinion on the ground that Ark failed to provide sufficient business justification for a rule that denied its off-duty employees entry to the area *outside* Ark's leasehold — including the surrounding hotel, casino, and parking lot. We agree that if Ark had such a rule, the justifications the employer offered would not support it. Ark argues that the access restrictions were necessary to reduce exposure to liability for workers' compensation claims and to facilitate supervision of its hundreds of employees. The Board has made clear, however, that to justify an access restriction under *Tri-County*, an employer may not merely rely on "vague" and "generalized" assertions, but must provide evidence to support its claimed need. *United Parcel Serv., Inc.*, 318 N.L.R.B. 778, 787–88 (1995), *enforced*, 92 F.3d 1221 (D.C. Cir. 1996). At oral argument, counsel for Ark conceded that there is no evidence in the record that the presence of off-duty employees has in the past, or would in the future, expose Ark to greater workers' compensation liability. The only evidence Ark's counsel proffered in support of the employer's alleged need to exclude off-duty em-

ployees in order to facilitate supervision of on-duty employees was a single case in which Isomura distributed union materials to another employee who was late for his shift; but there is no evidence that Isomura was the cause of the other employee's tardiness.

The problem with Board counsel's argument, however, is that it is doubtful that Ark's no-access rules actually barred off-duty Ark employees from the surrounding hotel, casino, and parking lot — or even from Ark's public restaurants. Only a few pages before the rules in question, the employee handbook states:

> All Ark Las Vegas employees are welcome to use the gambling facilities, when off-duty, at the Hotel. That is the explicit policy of New York–New York Hotel & Casino . . . . All of our employees, likewise, are welcome to dine at our restaurant outlets.

J.A. at 982. Moreover, in two other cases involving the New York New York Hotel and Casino, decided just two months before the instant case, the Board found that New York New York "permits, even encourages, off-duty employees of Ark to visit and patronize the casino and the restaurants in the complex and to use routes open to the public . . . to enter or exit," *New York New York Hotel, LLC*, 334 N.L.R.B. 762, 767 (2001), and that Ark employees are "invited to spend off-duty hours using the facilities," *New York New York Hotel, LLC*, 334 N.L.R.B. 772, 778 (2001).[6] It would be surprising if Ark's work rules were truly intended to bar its employees from

---

[6] In a consolidated petition for review of those decisions, Board counsel repeatedly advised this court that New York New York does not bar off-duty Ark employees from its complex. *See* Brief for the NLRB at 8, 25, 34, 38, *New York New York, LLC v. NLRB*, 313 F.3d 585 (D.C. Cir. 2002). We accepted those representations, and stated: New York New York "permits Ark employees, when they are off-duty, to visit and patronize the casino and restaurants, and to enter the complex through [its] public entrances, but they may not wear their uniforms, and the bars are off-limits at all times." *New York New York*, 313 F.3d at 586.

accepting these express invitations made by both Ark and New York New York.

The NLRB appears to be hopelessly confused regarding the areas to which the no-access rules applied. The brief of Board counsel suggests that only outside areas were of concern: specifically, the "parking lots and other, outside nonworking areas." NLRB Br. at 26–27. Yet, as we have noted, these are precisely the areas that do not appear to have been covered at all. The ALJ's opinion suggests concern that Ark's no-access rules also applied to "nonwork areas such as a locker room or restaurant." 335 N.L.R.B. No. 97, at 8. But the ALJ generally used the word "restaurant" to refer to one of the public restaurants operated by Ark inside New York New York — reserving "Employee Dining Room" for the separate employee facility — and the notion that Ark barred its off-duty employees from those restaurants is in conflict with the above-quoted statement that they were "welcome" to patronize them.

Nor does Ark bring any clarity to the question. At one point in its opening brief, the company states that the rules limited "access with respect to the interior of Ark's leased property and working areas," Ark Br. at 22, which suggests that the rules did apply to the public restaurants (which are working areas) but not to the employee dining room or locker room (which are largely non-working areas). This appears to be confirmed by another statement, that the rules did "not deny off-duty Ark employees access to parking lots or other non-work areas." *Id.* At still another point, however, the brief states that " 'property' in this context clearly refers to those locations leased to and operated by Ark," *id.* at 24–25, which would include the restaurants as well as the dining and locker rooms. Finally, Ark's reply brief states that the "employees clearly understood that Ark's access restriction rules applied to Ark's 'premises' that were working areas," and that they "were well aware that they could engage in solicitation and distribution activities on behalf of the Union in their off-duty time in non-working areas of Ark." Reply Br. at 4. This indicates that the restrictions applied to the

public restaurants, but not to the employee dining room or locker room.

Needless to say, it is impossible for this court (or the Board) to determine the law that applies to Ark's no-access rules without knowing what those rules were. Because the NLRB appears to have invalidated the rules based on a misunderstanding of their meaning, or at a minimum without considering the contradictory indications of their meaning described above, and because we "cannot sustain agency action on grounds other than those adopted by the agency in the administrative proceedings," we must set aside this aspect of the Board's order and remand the issue for further consideration and explanation. *United Food & Commercial Workers Int'l Union, Local 400 v. NLRB*, 222 F.3d 1030, 1034 (D.C. Cir. 2000) (internal quotation marks omitted).

## IV

For the foregoing reasons, we deny Ark's petition for review and grant the Board's cross-application for enforcement of the order in all respects, except to the extent that it concerns Ark's access restrictions. As to that issue, we set aside the order and remand for further proceedings.

*So ordered.*