# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 15, 2013          Decided April 26, 2013

No. 11-1326

FLAGSTAFF MEDICAL CENTER, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 11-1398

———

On Petition for Review and Cross-Application for
Enforcement of an Order
of the National Labor Relations Board

———

*Steven D. Wheeless* argued the cause for petitioner. With him on the briefs was *Alan M. Bayless Feldman*.

*Elizabeth A. Heaney*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

Before: HENDERSON, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Flagstaff Medical Center is an acute-care hospital in Arizona that has witnessed a flurry of union activity in recent years. This particular case finds its roots in October 2006, when the Communications Workers of America, Local Union 7019, AFL-CIO began organizing among Flagstaff's housekeeping and food services employees. The organizing campaign strained relationships with hospital management, and by January 2008, the union had charged Flagstaff with dozens of unfair labor practices under section 8(a)(1) and (3) of the National Labor Relations Act ("NLRA"). *See* 29 U.S.C. § 158(a)(1), (3). The ALJ hearing the case dismissed most of the allegations, concluding only eight had merit, and when the Board reviewed the ALJ's decision, it largely agreed. In short, a divided Board affirmed the eight § 8(a)(1) violations, reinstated four § 8(a)(1) and (3) charges the ALJ had dismissed, and affirmed the dismissal of everything else. *See Flagstaff Med. Ctr., Inc. & Commc'ns Workers of America, Local Union 7019* ("*Flagstaff*"), 357 NLRB No. 65, at 1–2 & n.1 (2011). Flagstaff now asks us to review three of the reinstated charges.

Rejecting the ALJ's findings, the Board concluded that Flagstaff violated § 8(a)(1) when its president, Bill Bradel, threatened employees that unionization would be futile; and that Flagstaff violated § 8(a)(1) and (3) by modifying employee Laverne Gorney's schedule in retaliation for her union activity and by firing employee Michael Conant because of his union activity. We agree the Board failed to muster substantial evidence for its conclusions about Bradel and Conant, so we grant Flagstaff's petition in part. We deny the petition in all other respects.

I

Section 8(a)(1) of the NLRA prohibits an employer's interference with, or restraint or coercion of, the rights of employees to organize and join unions, bargain collectively, and engage in certain other "concerted activities." 29 U.S.C. §§ 157, 158(a)(1). The Board concluded Flagstaff ran afoul of this provision when, in a June 2007 meeting with vice president of ancillary services Roger Schuler and food services department employees, Flagstaff president Bill Bradel said something to the effect that if there was a union, "I would not be negotiating with the union," or, "you won't be negotiating with me." According to the Board, this violated NLRA § 8(a)(1) because "employees could have reasonably construed Bradel's statement as indicating that [Flagstaff] would not bargain with the Union." *Flagstaff*, 357 NLRB No. 65, at 7. We disagree.

"An employer's statement violates the NLRA if, considering the totality of the circumstances, the statement has a reasonable tendency to coerce or interfere with those rights," *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001),[1] but as long as it does not do so by threat or

---

[1] Flagstaff insists the Board may find an employer's statement constitutes an unlawful threat of futility only if the employer "states or implies that it will ensure its non-union status by unlawful means," a standard Flagstaff believes imposes a higher bar to NLRA liability, Pet'r Br. at 29–31, but we need not address this claim because Flagstaff effectively concedes a statement tending to coerce or interfere with employees' rights violates the NLRA. *See* Reply Br. at 6 ("As a general proposition, the Board analyzes employer statements under Section 8(a)(1) by determining whether such statements reasonably tend to coerce employees in the exercise of their Section 7 rights."). Nor does the distinction matter

promise of benefit, an employer may "explain the advantages and disadvantages of collective bargaining to its employees in an effort to convince them that they would be better off without a union," *Winkle Bus Co.*, 347 NLRB 1203, 1205 (2006). We think that is what happened here. Bradel and Schuler established from the outset of the meeting that they wanted to learn about employees' issues, concerns, and problems. Employees voiced concerns about wages, work hours, the retirement plan, and benefits, and at the end of the meeting, Bradel said that "we appreciate the direct activity and that if we had a union that it would be difficult to have that same direct communication and I didn't think that, that would be necessary for [Flagstaff]." *Flagstaff*, 357 NLRB No. 65, at 31 (ALJ Op.). This makes sense given that the issues discussed presumably would be governed by a collective bargaining agreement. *See* 29 U.S.C. §§ 158(a)(5), 159(a).

Considering this context, we are baffled by the Board's interpretation of Bradel's subsequent first-person-singular statement about negotiations as a comment about Flagstaff's threshold willingness to negotiate—rather than as a statement about his own attendance at whatever meetings occur.[2] The record does not support this interpretive leap. *See Pac. Micr. Corp. v. NLRB*, 219 F.3d 661, 665 (D.C. Cir. 2000) ("To meet

here: we reject the Board's conclusions even under the standard it applied.

[2] Both Bradel, whose testimony the ALJ and Board credited, and employee Lydia Sandoval testified that Bradel's statement responded to an employee's claim that "you" will be dealing with "us." The ambiguity in the employee's statement—whether "you" meant Bradel individually or Flagstaff as a company—should be resolved in harmony with its context. The Board insists the meeting was infected by Flagstaff's general union animus, but it is not every company where employees feel comfortable engaging the president so directly.

the requirement of '[s]ubstantial evidence,' the Board must produce 'more than a mere scintilla' of evidence; it must present on the record 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into consideration the 'record in its entirety . . . including the body of evidence opposed to the Board's view." (internal citations omitted)).

Indeed, the record evidence about what Bradel actually said suggests Bradel implicitly recognized there would be negotiations. For instance, almost every witness who recounted Bradel's comment qualified it with the deictic phrase "like this," suggesting the comments expressly referred to a particular type of meeting rather than the possibility of a meeting. In the respective words of "outspoken union advocates" Shawn White and Lydia Sandoval, *Flagstaff*, 357 NLRB No. 65, at 31 (ALJ Op.), "He said he wanted us to think about our decision to unionize because, if we would unionize, we wouldn't have any more meetings with him like this," Hr'g Tr. at 360 (May 8, 2008) (J.A. 120), and "[H]e mentioned something about if bring the union in [sic], we won't be able to have any meetings with him like this again," Hr'g Tr. at 1197 (May 15, 2008) (J.A. 241). Similarly, multiple witnesses testified that Bradel said they "did not need a third party brought in" in order to resolve issues, *Flagstaff*, 357 NLRB No. 65**,** at 31 (ALJ Op.), which raises the question of what Bradel thought the "third party" would be doing if not helping employees resolve issues with Flagstaff. *See also* Hr'g Tr. at 1232 (May 15, 2008) (J.A. 247) (Sandoval testifying that Bradel said "he didn't feel like employees needed third party representation"). Hardly a statement that unionizing would be futile.

The Board was troubled by the fact that Bradel— Flagstaff's "highest-ranking official"—did not make the

contested comment immediately after his statement about direct communication but did so "in direct response to an employee's assertion that employees needed union representation." *Flagstaff*, 357 NLRB No. 65, at 7. Yet this does not mean, as the Board thought, that deeming Bradel's comment innocuous would render it a non sequitur; nor does Bradel's status as president necessarily mean, as the Board also thought, that employees reasonably would think he was speaking for Flagstaff. Access to one of the company's highest executives may very well be relevant to gauging the usefulness of union representation, and Bradel's emphasis on his appreciation of "direct communication" with employees would make little sense if he did not in fact hold a high position in the company.

At oral argument, the Board warned us against second-guessing its expertise where we know nothing about the tone of voice Bradel used when making the contested statement or the body language accompanying it. But of course, the person entrusted with evaluating witness credibility—the ALJ—articulated his judgment about the factual record by finding no NLRA violation. *See Local 702, Int'l Bhd. of Elec. Workers v. NLRB*, 215 F.3d 11, 15 (D.C. Cir. 2000). The Board adopted the ALJ's credibility findings, so we are just following its lead.

II

"[A]n employer violates the NLRA by taking an adverse employment action in order to discourage union activity." *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 104 (D.C. Cir. 2003); *see* 29 U.S.C. § 158(a)(3). To determine whether an employer's motive was unlawful, the Board applies a burden-shifting scheme known as the *Wright Line* test. Under it, General Counsel for the NLRB has the initial burden of

showing that the employee's protected conduct was a "motivating factor" in the adverse employment decision; once it makes this showing, the employer may escape liability only if it shows by a preponderance of evidence that it would have taken the same action even had there been no protected conduct. *See Ark Las Vegas Rest. Corp.*, 334 F.3d at 104. We evaluate the Board's conclusions about Gorney and Conant within this framework.

A

Laverne Gorney has worked in the food services department for over ten years, most recently as a dishwasher. On May 26, 2007,[3] Gorney appeared in a pro-union advertisement in the local newspaper; in June, she was assigned to a "very unusual" number of weekend shifts. *Flagstaff*, 357 NLRB No. 65, at 48 (ALJ Op.). In concluding general counsel satisfied its *Wright Line* burden, the Board relied on Flagstaff's other NLRA violations as evidence of general animus toward unions, as well as the suspicious timing of the schedule change. Flagstaff's rebuttal attempts fell short, the Board explained, because they either pertained to Gorney's July and August schedules without saying anything about her June schedule, or were unhelpfully vague. We will not disturb these findings.

Motive is a question of fact, so the Board's inferences about unlawful motive are entitled to substantial deference. *See Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995). The Board concluded Jeanine Drake, the director of

---

[3] No date appears on the advertisement in the record. One witness testified the advertisement was published "[s]omewhere in [the] range" of May 28, Hr'g Tr. at 647 (May 9, 2008), but since the parties seem to agree it came out May 26, we ignore this potential discrepancy.

the food services department who set Gorney's schedule, interfered with the union campaign by telling employees not to discuss their wages, by coercively interrogating an employee about the usefulness of a union (and in the process, calling the nurses' union "foolish"), and by implicitly suggesting a newly-hired employee would be laid off if the hospital unionized. The Board could reasonably find that in doing so, Drake demonstrated anti-union animus. *See, e.g.*, *Lee Builders, Inc.*, 345 NLRB 348, 349 (2005) (inferring anti-union animus when managers "threatened employees with job loss and plant closure if the Union were to succeed in the organizing campaign"); *see also Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 923 (D.C. Cir. 2005). If so, and Drake assigned Gorney a very unusual shift schedule soon after Gorney began publicly supporting the union—which Drake admitted seeing—then the Board could reasonably infer an unlawful motive for the schedule change. *See Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 955 (D.C. Cir. 1988) ("[T]he Board may consider such factors as the employer's knowledge of the employees' union activities, the employer's hostility towards the union, and the timing of the employer's action." (internal citations omitted)).

Flagstaff, for its part, disputes the factual premises propelling this analysis. First, Flagstaff challenges the "majority's finding that the June shift was 'very unusual,'"[4] Pet'r Br. at 51 n.10, and second, it argues that "the schedule for each upcoming month comes out on the 25th of the prior month" so "Drake would have already made and posted the June schedule *before* Gorney's appearance in the newspaper on May 26, 2007." Pet'r Br. at 49. Presumably, the Board's

---

[4] This is perhaps Flagstaff's artful way of avoiding the consequences of its failure to raise the issue below: it was not the Board that found the June shift to be very unusual, but the ALJ.

reasoning would fall apart without these factual linchpins. If, for instance, Gorney's June schedule had nothing to do with her union activity, then it is not clear how her subsequent schedules could be the product of her union activity: her July schedule was hardly unusual if she had a comparable schedule the previous month. Flagstaff's failure to address Gorney's June schedule in its rebuttal arguments would no longer matter, and we might be more inclined to question the Board's invocation of Flagstaff's general union animus to prove Drake's specific motivation. *See Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1327–28 (D.C. Cir. 2012); *Warshawsky & Co. v. NLRB*, 182 F.3d 948, 956 (D.C. Cir. 1999).

But no matter: Flagstaff raised neither argument before the Board, so we have no jurisdiction to consider them. *See* 29 U.S.C. § 160(e). The Board deemed the June schedule very unusual precisely because Flagstaff never contested the ALJ's finding to that effect, *see* 29 C.F.R. § 102.48(a), and Flagstaff, though pointing to a few arguments in the record it thinks sufficient to meet its jurisdictional burden, identifies nothing that would have put the Board on notice about the timing of Drake's June scheduling decision. *See Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 727 F.2d 1184, 1191–92 (D.C. Cir. 1984).

We may consider arguments not raised before the Board in "extraordinary circumstances," 29 U.S.C. § 160(e), but Flagstaff gives us no reason to think these circumstances are anything but ordinary. Perhaps Flagstaff might be excused from raising these arguments before the Board rendered its decision. *Compare Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 n.10 (1979) (rejecting argument that a party need not object to ALJ recommendation where it has "no practical reason" to do so, explaining that accepting this as

"extraordinary circumstance" would undermine the statutory exception and that party in fact had a reason to challenge the recommendation when the opposing party excepted to it), *with NLRB v. Good Foods Mfg. & Processing Corp.*, 492 F.2d 1302, 1305 (7th Cir. 1974) (noting that courts sometimes excuse a party's failure to file exceptions to the ALJ's findings where the findings "were favorable to the petitioner, were subsequently reversed by the Board, and petitioner had no reason to file exceptions to a decision in its favor"). But we will not excuse its failure to raise them afterwards in a motion for reconsideration. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982); *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1255 (D.C. Cir. 2012); *Epilepsy Found. of Ne. Ohio v. NLRB*, 268 F.3d 1095, 1101–02 (D.C. Cir. 2001).

B

Michael Conant, a Flagstaff housekeeper, began wearing a union button in July 2007; he was fired in August. Though Conant had a record of poor attendance during his two years at Flagstaff, the Board found that Flagstaff had general anti-union animus, that the timing of Conant's discharge was suspicious, and that Flagstaff's enforcement of the company attendance policy was highly—and therefore suspiciously—inconsistent. We think the Board failed to justify these findings with substantial evidence.

Flagstaff's attendance policy provides that "[e]xcessive absenteeism and tardiness . . . may result in disciplinary action to include termination." J.A. 373. It also lists the sanctions to be imposed for specified numbers of absences in any rolling six- or twelve-month period. Four absences in any rolling six-month period, or seven in any twelve-month period, results in a verbal warning; five absences in any six-

month period, or eight in any twelve-month period, results in a written warning; six absences in any six-month period, or nine in any twelve-month period, results in a final warning and possible suspension; and seven absences in any six-month period, or ten in any twelve-month period, results in termination. *See Flagstaff*, 357 NLRB No. 65, at 8.

By the summer of 2007, Conant had already received verbal and written warnings and a three-day suspension. The suspension apparently did not faze him. He missed work four more times before he was fired: once in May, once in June, and twice in July—making a total of twelve unscheduled absences in twelve months. No one denies this entitled Flagstaff under the attendance policy to fire Conant.

The Board makes much of the fact that Flagstaff did not do so until after Conant began wearing a union button, but the record easily explains this apparent oddity: in mid-June, the director of the housekeeping department stepped down and an interim director, Joe Brown, took over. Conant was absent only twice after that, and Brown did not know about either absence until the department secretary brought the second one to his attention. At that point, Brown reviewed Conant's file, confirmed with the director of human resources that firing Conant would comport with Flagstaff policies,[5] and got the go-ahead from Schuler. He fired Conant on August 1. (Both the ALJ and the Board credited Brown's testimony about the matter.)

Only Brown and Schuler were involved in the decision to fire Conant, and there is no substantial evidence either had an

---

[5] The record is ambiguous about who spoke to the director of human resources—Brown, Schuler, or both of them—but like the parties and the ALJ, we ascribe no significance to that fact.

unlawful motivation. *See Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 422 (D.C. Cir. 1996) (explaining that general counsel must prove "that the employer knew of the employee's pro-union activities," "that the timing of the alleged reprisal was proximate to the protected activities," and that "there was anti-union animus to link the factors of timing and knowledge to the improper motivation" (internal quotation marks omitted)). First, there is little reason to think Schuler knew anything about Conant's unionizing. The Board—which in its decision below referenced Schuler only to note that he "reviewed and approved [Brown's] recommendation," *Flagstaff*, 357 NLRB No. 65, at 9—now points to an affidavit in which Schuler stated that "[a]t the time of his termination, I could guess that Conant supported the union." Hr'g Tr. at 106 (May 6, 2008) (J.A. 68). The Board considers this a damning admission. Not so. Schuler clearly testified that his admittedly ambiguous statement did not mean what the Board now asserts but rather meant only that "at the time I was giving the affidavit, in retrospect" he could have guessed Conant supported the union. Hr'g Tr. at 104 (May 6, 2008) (J.A. 66). Indeed, when signing the affidavit, Schuler handwrote a qualifier next to the controverted statement: "Based on conversations I had with him in which he often expressed his dissatisfaction with management and other work related issues. I never saw him wear a union shirt or button, nor did he ever overtly express his union support to me." Hr'g Tr. at 106 (May 6, 2008) (J.A. 68).

The Board argues in the alternative that even assuming Schuler "was personally unaware of Conant's union support, his lack of personal knowledge is not determinative" because the Board could reasonably impute such knowledge to him. Resp't's Br. at 48–49. This makes no sense. If general counsel relies on circumstantial evidence and legal fictions about

constructive knowledge, it does so to carry its burden of showing the decisionmaker knew about the employee's union activity. *See, e.g.*, *Avecor, Inc. v. NLRB*, 931 F.2d 924, 928–29 (D.C. Cir. 1991); *Wolf Trap Foundation*, 287 NLRB 1040, 1041 (1988); *Kimball Tire Co., Inc.*, 240 NLRB 343, 344 (1979). Permitting circumstantial evidence and legal fictions to trump direct proof to the contrary is absurd. *See Chevron Mining, Inc.*, 684 F.3d at 1327–28; *see also Vulcan Basement Waterproofing of Il. v. NLRB*, 219 F.3d 677, 685 (7th Cir. 2000).

Second, though Brown testified he knew about Conant's union activity by July, the record does not support the inference that Conant's union activity played any role in Brown's decision or, put differently, that Brown would not have recommended discharge anyway. We reject the Board's reliance on Bradel's alleged unlawful threats to "demonstrate[] that union animus . . . pervaded [Flagstaff]," Resp't's Br. at 50; *see Parsippany*, 99 F.3d at 423–24, because we do not think Bradel's statements were improper—and the Board's circumstantial case cannot survive that conclusion because Brown had nothing to do with any of Flagstaff's NLRA violations. Nor can the Board impute animus to Brown directly because there is no such evidence in the record.

Both the ALJ and the Board credited Brown's testimony that he followed Flagstaff's attendance policy and, "from the inception of his tenure with [Flagstaff], attempted to enforce [Flagstaff's] policies with consistency." *Flagstaff*, 357 NLRB No. 65, at 55 (ALJ Op.). As written, the policy is ambiguous: it is possible to have accumulated no more than four or five absences in any six-month period but nevertheless exceed nine absences in a twelve-month period, thereby requiring both warnings *and* discharge. The record shows Brown

understood the policy to mandate an incremental approach whereby, for example, it would be inappropriate to fire an employee who had not yet received a final warning.[6] When Monika Coby-Thompson had her ninth and tenth unscheduled absences in six months, Brown suspended her for three days rather than firing her because she had hitherto received only verbal and written warnings. When Haskielena Begay had her sixth unscheduled absence in six months, Brown issued a written warning rather than a final warning because she had hitherto received only a verbal warning (though he subsequently suspended her as well for a separate policy violation). But even under Brown's relatively lenient understanding of the policy, Conant's excessive absences warranted discharge. *See, e.g.*, *MECO Corp. v. NLRB*, 986 F.2d 1434, 1438 (D.C. Cir. 1993) ("Absent a showing of anti-union motivation . . . an employer may discharge an employee for a good reason, a bad reason, or no reason at all without running afoul of the labor laws." (internal quotation marks omitted)).

There appear to be two instances where a supervisor ostensibly under Brown's authority failed to escalate the sanction though the escalation would have been warranted and the employee had already received the same level of discipline, but we think this insignificant in light of the ALJ and Board's conclusion that Brown tried to enforce Flagstaff's policies consistently and the record evidence that Brown generally did so in fact. *See MECO Corp.*, 986 F.2d at

---

[6] Brown recommended firing a probationary employee who had not received any warning, but the employee's probationary status refutes any attempt to cite that recommendation as an example of inconsistent enforcement. *See Rest. Corp. of Am. v. NLRB*, 827 F.2d 799, 806 (D.C. Cir. 1987) ("Disparate enforcement inherently requires a finding that the employer treated *similar* conduct differently." (emphasis added)).

1437. Perhaps controversy over Flagstaff's attendance policy might have been avoided if the housekeeping department had done a better job tracking employee absences so that an employee received, for example, the verbal warning immediately after a fourth unscheduled absence rather than after the fifth, but it is unreasonable to find animus merely because Brown's reliance on the department secretary to track absences and the exigencies of day-to-day work led to a few false negatives. This of course assumes Brown was even at Flagstaff when both incidents occurred, which is not at all clear from the record. *See* Hr'g Tr. at 463 (May 8, 2008) (J.A. 135) (Brown testifying, "I've been at five different hospitals in the last year.").

## III

Because there is no substantial evidence justifying the Board's findings that Bradel's comments violated NLRA § 8(a)(1) or that Conant's discharge violated § 8(a)(1) and (3), we grant Flagstaff's petition in part. We grant the Board's application for enforcement of its order in all other respects.

*So ordered.*