# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 10, 2012         Decided April 20, 2012

No. 11-1054

STEPHENS MEDIA, LLC, DOING BUSINESS AS HAWAII
TRIBUNE-HERALD,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

HAWAII NEWSPAPER GUILD, LOCAL 39117,
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,
INTERVENOR

---

Consolidated with 11-1088

---

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

---

*L. Michael Zinser* argued the cause for petitioner. With him
on the briefs was *Glenn E. Plosa*.

*Daniel A. Blitz*, Attorney, National Labor Relations Board,
argued the cause for respondent. With him on the brief were
*John H. Ferguson*, Associate General Counsel, *Linda Dreeben*,
Deputy Associate General Counsel, and *Julie B. Broido*,

Supervisory Attorney.

*Matthew J. Ginsburg* argued the cause for intervenor Hawaii Newspaper Guild, Local 39117, Communications Workers of America, AFL-CIO. With him on the brief were *James B. Coppess* and *Barbara Lynn Camens*.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Hawaii Newspaper Guild, Local 39117, Communications Workers of America, AFL-CIO ("the Union") filed charges against Stephens Media, LLC, doing business as the Hawaii Tribune-Herald ("the Company"), alleging that the Company had committed multiple unfair labor practices in violation of the National Labor Relations Act ("the NLRA" or "the Act"). The National Labor Relations Board ("the NLRB" or "the Board") found merit to virtually all of the charges and ordered the Company to undertake certain remedial actions. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 3–5 (Feb. 14, 2011). The Company seeks review of the Board's Decision and Order; the Board seeks enforcement.

We hereby grant the Board's cross-application for enforcement. Substantial evidence and controlling precedent support the Board's findings, and the Board's well-reasoned decision amply explains its judgment. Only two points merit our amplification.

First, with respect to employee Hunter Bishop, the Board found that the Company violated section 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3), (1) (2006), by suspending and discharging Bishop for engaging in protected "concerted activities," *id.* § 157. The Company's objections to that finding and its two justifications for Bishop's termination are

unavailing. The Company asserts that, after discharging Bishop, it discovered that he had been deficient in his work productivity. The Board found, and we agree, that the Company's claim is pretextual. The Company also contends that Bishop engaged in disloyal conduct after he was fired. The Board held, however, that Bishop's conduct did not render him "unfit for further service, or a threat to 'efficiency in the plant.'" *O'Daniel Oldsmobile, Inc.*, 179 N.L.R.B. 398, 405 (1969) (citations omitted). We can find no basis to overturn the Board's judgment on this point. Therefore, as the Board held, Bishop is entitled to reinstatement and backpay. We are jurisdictionally barred from considering the Company's arguments that the NLRB committed either legal error in adopting *O'Daniel Oldsmobile* as the governing standard or factual error in applying that standard. *See* 29 U.S.C. § 160(e).

Second, with respect to employees Dave Smith, Peter Sur, Christine Loos, and William Ing, the Board found that the Company violated section 8(a)(3) and/or (1) of the Act by interrogating them, suspending Smith and Sur, and discharging Smith for engaging in protected concerted activity. The Company says that the cited employees engaged in unprotected activity when they participated in making a surreptitious audio recording of a conversation between Smith and a member of management. Therefore, according to the Company, the actions taken against the employees did not constitute unfair labor practices. The Board's decision rejecting the Company's claim rests on three grounds: under established Board precedent, there is no *per se* rule that the making of surreptitious recordings is unprotected activity; the Company had no policy in effect prohibiting audio recordings; and it is undisputed that the recording was not unlawful under state or local law. We defer to the Board's judgment, because it is based on reasoned decisionmaking, supported by substantial evidence, and consistent with controlling precedent.

4

## I.    Background

**A.    The Facts**

The Company publishes a newspaper in Hilo, Hawaii. The editor of the newspaper is David Bock, and the publisher is Ted Dixon. The Company's news staff employees are represented by the Union. Employees Koryn Nako, Hunter Bishop, and Dave Smith have served as Union shop stewards.

The circumstances leading to this petition for review and cross-application for enforcement are largely undisputed. We focus on the facts that are relevant to the portions of the Board's Decision and Order that merit amplification. We first address the events relevant to the Company's suspension and discharge of Bishop. We then turn to the events surrounding Smith's making of a secret recording of a conversation with Bock. The facts that are recited below are drawn directly from the Decision and Order of the Board, *see Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63 (Feb. 14, 2011), and from documents in the record before the court.

1.    Bishop's Suspension and Termination

On October 18, 2005, Union representative Ken Nakakura asked to meet with Nako. They initially met outside the Company building, but Nako then brought Nakakura through the employee entrance into the break room, where they were joined by Bishop. Bock and the Company's advertising director, Alice Sledge, entered the break room shortly thereafter. Upon identifying Nakakura as a Union representative, Bock asked who had admitted Nakakura into the building. Nako volunteered that she had done so. Bock stated that it was a violation of the Company's access policy for a Union representative to be in the building without receiving prior management approval. Bock then escorted Nakakura out of the building.

When Bock returned, he asked to speak with Nako. As they

were preparing to leave the break room, another employee, Sharon Maeda, asked Bishop if someone should accompany Nako. Nako signaled her approval by looking to Bishop and saying "okay." *Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 7. Bishop followed Bock and Nako, prompting Bock to tell Bishop that the discussion did not involve him. Bishop then inquired whether the meeting could result in a disciplinary action – apparently attempting to ascertain whether Nako was entitled to bring a witness to the meeting under *NLRB v. J. Weingarten, Inc*. *See* 420 U.S. 251 (1975) (holding that an employer commits an unfair labor practice by compelling an employee to attend an investigatory meeting that could lead to discipline without allowing the employee to bring a union witness). Bock replied that he would be having a discussion with Nako. Bishop asked one or two more times whether the meeting could lead to discipline, and Bock stated that the meeting was none of Bishop's business. Bishop eventually withdrew, telling Nako from about twenty feet away that he would be available, if she needed him.

The testimony before the Administrative Law Judge ("ALJ") indicates that, during this confrontation, Bishop spoke in a "moderately loud," "elevated," or "strong projecting" voice. *Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 9. At no point, however, did Bishop yell, threaten Bock, or use profanity. *Id.* at 8–9, 20. Indeed, the ALJ and NLRB expressly discredited witnesses who testified that Bishop shouted or became excessively angry. *See id.* at 9; *see also id.* at 1 n.2.

Company officials questioned Nako several times about admitting Nakakura into the building and about Bishop's confrontation with Bock. The Company also prepared a statement documenting Nako's version of the confrontation between Bock and Bishop, which she signed on October 19. On October 26, Nako received a warning for admitting Nakakura into the building without receiving management's prior

approval.

Meanwhile, on October 19, Bock summoned Bishop to Bock's office, where Bock suspended Bishop indefinitely, without pay. Bock explained that Bishop's conduct in trying to prevent Bock from meeting with Nako had been unacceptable. Bock also referenced Bishop's disciplinary record. Bock sent Bishop a termination letter several days later, which stated: "[W]e are discharging you because of your misconduct on October 18, 2005. You were disrespectful of supervisory authority, insubordinate and disruptive of my efforts to have a conversation with one of our employees." Letter from David Bock to Hunter Bishop (Oct. 27, 2005), *reprinted in* II Joint App. ("J.A.") 870. After the Company discharged Bishop, employees wore buttons at work indicating their support for him. In response, the Company circulated a memo prohibiting employees from wearing these buttons during work hours. *See* Letter from Ted E. Dixon (Nov. 1, 2005), II. J.A. 880.

The Union filed grievances to challenge the disciplinary actions taken against Bishop and Nako. On several occasions in October and November 2005, the Union requested information and documents relevant to these grievances, including Bishop's personnel file, witness lists, Nako's signed statement, and copies of company policies. The Company failed to give the Union Bishop's personnel file until early 2006, and it consistently refused to provide other requested documents.

In December 2005, Bishop attended a public event at the Hilo campus of the University of Hawaii. There, he spoke critically about the Company, claiming that it had failed adequately to staff the newsroom and that he had considered starting a rival newspaper.

In February 2006, Bock sent another letter to Bishop. According to the Board,

[the] letter cited additional reasons for Bishop's discharge

including poor productivity and participation in a forum at the University of Hawaii-Hilo where Bishop allegedly made disparaging, defamatory, disloyal remarks about the Hawaii Tribune-Herald. In the letter, Bock claim[ed] he failed to compile Bishop's productivity numbers at the time of his termination on October 27, 2005, and that a later review of the number of stories Bishop produced shows he failed to meet productivity standards. According to Bock, Bishop was producing .81 stories per day and the standard was one story per day. Bishop had previously been counseled about his low productivity in May 2002 and September 2003, he received a warning for low production in October 2003 and was suspended for low production on May 6, 2004.

*Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 10. Bishop made additional critical statements about the Company on his blog in April and September of 2007. *See id.* at 9–10.

2. Smith's Recording

On March 3, 2006, employee Jason Armstrong asked Smith to serve as a witness to a meeting during which Armstrong expected to receive a warning from Bock. *See id.* at 10. Smith tried to accompany Armstrong to the meeting, but Bock refused to allow Smith to attend. Bock also told Smith that they needed to meet privately later that day.

Smith expected that he too would receive a warning from Bock and that Bock would not allow him to bring a union witness to their meeting. Smith believed that, under the Supreme Court's *Weingarten* decision, he was entitled to have a witness attend the meeting with him. Smith called the Union administrator, Wayne Cahill, who advised Smith to take notes during the meeting. After talking with Cahill, however, Smith discussed the situation with three other bargaining unit employees: Peter Sur, Christine Loos, and William Ing. They concluded that, rather than take notes, Smith should surreptitiously record his conversation with Bock using Sur's

voice recorder. The Company did not have any policy at the time regarding the making of secret audio recordings, *see id.* at 15, nor was there any local or state law prohibiting the making of such recordings, *see* HAW. REV. STAT. § 803-42(b)(4) (1993 & Supp. 2011). Sur offered to lend his recorder to Smith, and Loos and Ing also encouraged Smith to record the conversation. Their planning was overheard by another employee, Karen Welsh.

When Smith met with Bock later that day, he concealed the recorder within his shirt. At the outset of the conversation, Smith requested that Bock allow a witness to attend the meeting, but Bock refused. Bock then issued an oral warning to Smith, citing Smith's inadequate productivity. When Smith asked for more details as to how his productivity had been measured, Bock provided some additional information and then told Smith to check the numbers himself.

On March 6, Welsh informed Bock that Smith had recorded the March 3 meeting with a concealed voice recorder. This disclosure prompted Bock to investigate the matter further. He first interrogated Sur, who admitted to providing the recorder to Smith. When asked to explain why Smith had recorded the conversation, Sur answered that they had believed that Smith, like Armstrong, would be denied access to a witness during a meeting that could lead to discipline. And when asked about the whereabouts of the recorder, Sur said that it was still in Smith's possession. Bock suspended Sur indefinitely and without pay.

Bock then met with Smith, who admitted to recording the March 3 meeting. Bock asked why Smith had made the recording, and Smith explained that he had wanted to preserve an accurate record, since he had known that Bock would not allow a witness to observe the meeting. Bock also asked why Smith had not obtained permission to record the meeting; Smith answered that he had not needed permission, since there was no law or company policy prohibiting the making of secret audio

recordings. At the end of the meeting, Bock suspended Smith indefinitely and without pay. Ing and Loos were also interrogated regarding the incident but never disciplined.

On March 10, Bock called Sur to ask for permission to recover the recorder from Smith. Sur agreed, and Bock told Sur to return to work on March 11. Bock then requested that Smith turn over the recorder as well as any recording to the Company, but Smith replied that he had already given the recorder to the Union. On March 13, employees in the advertising department wore red armbands to a meeting to show support for Smith. Later that day, they received a letter from the Company prohibiting the wearing of such armbands during working hours. *See* Letter from Ted E. Dixon (Mar. 13, 2006), II J.A. 881.

On March 15, Dixon sent a letter to every employee and member of management, announcing an official policy prohibiting the making of secret audio recordings. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 19; *see also* Letter from Ted E. Dixon to Peter Sur (Mar. 15, 2006) ("Recording Policy"), II. J.A. 887. The letter stated in relevant part:

> [T]wo employees were suspended without pay involving an incident in which a conversation with a supervisor was secretly audio-taped. This is egregious misconduct. . . . Making secret audio recordings is not permitted. It is wrong, we have taken action, and we will do again in the future with respect to any secret recording/taping in the work place.

Recording Policy, II J.A. 887.

On March 17, Smith received a written directive from Bock to retrieve the recorder and recording from the Union and turn them over to the Company. Cahill responded on Smith's behalf by notifying Bock that the Union was filing a grievance over Smith's suspension. Bock sent Smith another letter on March 22, stating that Smith's failure to produce the recorder and

recording was an act of insubordination. Bock met with Smith and Cahill on March 27 to discuss the recording. Then, in April, Bock met privately with Smith and presented Smith with a letter to sign, admitting that making the surreptitious recording had been serious misconduct and accepting that future recordings would result in discharge. *See* Letter from David Bock to Dave Smith (Apr. 11, 2006), II J.A. 871–74. Smith refused to sign the letter, and, several weeks later, the Company fired him. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 12.

**B. Decision Below**

After the Union filed unfair labor practices charges, the Board's Regional Director issued a consolidated complaint against the Company on March 30, 2007. *See id.* at 6. The complaint alleged that the Company had committed multiple violations of sections 8(a)(1), (3), and (5) of the Act, 29 U.S.C. § 158(a)(1), (3), (5). As the ALJ summarized:

> The consolidated complaint . . . alleges that [the Company] violated Section 8(a)(1) of the [Act] by interrogating employees regarding their and other employees' union and concerted activities; selectively and disparately enforcing a security policy by requiring union representatives to obtain [the Company's] permission to enter [its] facility; creating the impression that employees' union and concerted activities were under surveillance; prohibiting the wearing of union paraphernalia; and issuing and maintaining an overly broad rule prohibiting the making of secret audio recordings.

> It is alleged that [the Company] violated Section 8(a)(3) of the Act by disciplining employees Koryn Nako (Nako) and Peter Sur (Sur) and by terminating employees Hunter Bishop (Bishop) and Dave Smith (Smith).

> Finally, the General Counsel alleges [the Company] violated Section 8(a)(5) of the Act by failing to provide

information to the Union.

*Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 6 (footnote omitted).

On March 6, 2008, the ALJ issued a decision finding merit to virtually all of the allegations against the Company – save the charge alleging that the Company had created an impression of surveillance. *See id.* at 1, 13–27. The Company filed exceptions, and the General Counsel filed limited exceptions. *See id.* at 1. The NLRB "affirm[ed] the judge's rulings, findings, and conclusions," with certain minor modifications. *Id.* (footnote omitted). We discuss the specifics of the Board's Decision and Order, as necessary, at greater length below. The Company filed a petition for review with this Court; the Board filed a cross-application for enforcement.

## II.    Analysis

### A.    Finality

There is no jurisdictional impediment to this court's review of the Board's Order and Decision. There is, however, a question whether the Board's action is "final." To be final and, hence, reviewable, an agency action "must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (internal quotation marks omitted). The action also "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178) (internal quotation marks omitted). As we explain below, the challenged Decision and Order satisfies both conditions.

We address the matter of finality, because, in rendering its Decision and Order in this case, the Board reserved judgment on one issue. Having found that the Company had violated section

8(a)(5) and (1) "by failing and refusing to furnish, and delaying in furnishing, the Union relevant and necessary information that it ha[d] requested," the Board ordered the Company "to furnish the Union with the requested information, excluding Koryn Nako's October 19, 2005 witness statement and any other witness statements that the [Company] obtained in the course of its investigation of Bishop's alleged misconduct." *Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 4. The Board noted that "precedent establishes that the duty to furnish information 'does not encompass the duty to furnish witness statements themselves.'" *Id.* at 3 (citations omitted). But the Board also found that "precedent does not clearly define the scope of the category of 'witness statements.'" *Id.* The Board therefore decided to "sever this allegation from the case and to solicit briefs on the issues it raises." *Id.* It appears that the severed issue remains pending before the Board. After the petition for review and cross-application for enforcement were filed with this court, we directed the parties to address whether this matter is properly before the court, "in light of the severed matter."

We conclude that the matter before the court is final and fit for review. The Decision and Order establishes the rights and obligations of the Company and its employees with respect to recently established policies, the suspension and discharge of Bishop and Smith, the disciplinary actions taken against Nako and Sur, the interrogation of those and other employees, and the Company's obligations to provide *other* materials to the Union. The severed issue was removed by the Board from the realm of this case. Neither party suggests that the case *sans* the severed issue is unripe for review. And the severed issue is not intertwined with the findings that we review here, so our review will not "disrupt the orderly process of adjudication" over the Union's request for Nako's witness statement. *E.g.*, *Exportal Ltda. v. United States*, 902 F.2d 45, 48 (D.C. Cir. 1990) (citations omitted) (internal quotation marks omitted). We therefore proceed to consider the merits of the parties' positions.

## B. Standard of Review

"As we have noted many times before, our role in reviewing an NLRB decision is limited. 'We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.'" *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011) (citation omitted). We give "substantial deference" to inferences the Board draws from the facts. *Halle Enters., Inc. v. NLRB*, 247 F.3d 268, 271 (D.C. Cir. 2001) (citation omitted) (internal quotation marks omitted). An ALJ's determinations regarding the credibility of witnesses will not be reversed "unless those determinations are hopelessly incredible, self-contradictory, or patently unsupportable." *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 924 (D.C. Cir. 2005) (citation omitted) (internal quotation marks omitted). Finally, we also must accord considerable deference to the NLRB's policy judgments and other determinations that are based on its expertise. *See, e.g.*, *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786–87 (1990). "Determining whether activity is concerted and protected within the meaning of [the NLRA] is a task that 'implicates [the Board's] expertise in labor relations.' The Board's determination that an employee has engaged in protected concerted activity is entitled to considerable deference if it is reasonable." *Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005) (second alteration in original) (citation omitted).

## C. Insubstantial Challenges Raised by the Company

The Company has contested all of the Board's findings; consequently, none may be summarily affirmed. *See, e.g.*, *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006) (explaining that charges may be summarily enforced when a party "does not contest them" (citation omitted)). But

we need address only two aspects of the Board's Decision and Order, "because the company's other challenges are met by sufficient evidence in the record to support the Board's findings." *W.C. McQuaide, Inc. v. NLRB*, 133 F.3d 47, 49 (D.C. Cir. 1998). Accordingly, we grant without amplification the Board's cross-application for enforcement as to the following findings:

> [T]he [Company] violated Section 8(a)(1) of the Act by: interrogating employees; disparately and discriminatorily enforcing its security access policy against the Union; [and] discriminatorily prohibiting employees from wearing buttons and armbands in support of discharged or suspended employees; and promulgating and maintaining a rule prohibiting employees from making secret audio recordings of conversations in response to protected activity . . . . [T]he [Company] violated Section 8(a)(3) and (1) by: issuing a written warning to employee Koryn Nako . . . . [T]he [Company] violated Section 8(a)(5) and (1) by refusing to provide or delaying the provision of relevant information requested by the Union.

*Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 1, 3.

## D. Bishop's Confrontation with Bock Was Protected and the Company's Post-discharge Justifications for His Termination Are Unavailing

The Board found that the Company violated section 8(a)(3) and (1) of the Act by "suspending . . . Hunter Bishop" and later "discharging" him. *Id.* at 1. The Board therefore ordered the Company to offer to reinstate Bishop, to compensate him for lost earnings, and to remove any references to the suspension or termination from his file. *See id.* at 3–4.

"It is well settled that an employer violates the NLRA by taking an adverse employment action in order to discourage union activity." *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d

99, 104 (D.C. Cir. 2003) (citations omitted). Section 8(a)(3) makes it an unfair labor practice for an employer, "by discrimination in regard to . . . tenure of employment . . . to . . . discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 7 guarantees employees the right to engage in "concerted activities for the purpose of . . . mutual aid or protection." *Id.* § 157. That right, in turn, is "protected by Section 8(a)(1) of the Act, which makes it an unfair labor practice for an employer 'to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7." *Citizens Inv. Servs. Corp.*, 430 F.3d at 1197 (alteration in original) (citation omitted). Courts are to construe section 7 broadly when considering whether activities qualify as protected. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 563–70 (1978).

The Board found that the Company illegally suspended and discharged Bishop for engaging in protected concerted activities. The Company initially based its suspension and discharge of Bishop on his confrontation with Bock on October 18, 2005. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 9. Bishop initiated that confrontation, because he reasonably believed that Bock was about to conduct an investigatory, disciplinary interview with Nako, without allowing her to bring a witness, *see id.* at 20–21, in violation of her rights under the NLRA, *see Weingarten*, 420 U.S. at 260–64. Furthermore, Nako had signaled to Bishop that she wanted him present during that meeting. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 20. The Board thus concluded that Bishop was acting in his capacity as shop steward when he attempted to intervene on Nako's behalf and that, consequently, his conduct was protected. That determination is eminently reasonable and, therefore, it is entitled to our deference.

The Company avers that Bishop was not engaged in protected activity when he confronted Bock. The Company argues that Nako may have assented to Bishop's presence, but

she did not request it.  *See id.* at 7, 8, 20.  The Company points to Board decisions holding that, to be entitled to a union witness in a meeting, an employee must "initiate the request for representation."  *See Appalachian Power Co.*, 253 N.L.R.B. 931, 933–34 (1980), *enforced* 660 F.2d 488 (4th Cir. 1981) (unpublished).  The Company additionally argues that Bishop confronted Bock based on his subjective belief that Nako was about to be disciplined.  Under *Weingarten*, an employee is entitled to a witness only if she or he *reasonably* believes that the investigation will result in discipline.  *See Weingarten*, 420 U.S. at 257 & n.5.  The Company thus contends that Bishop's subjective views could not have satisfied *Weingarten*'s *objective* test.

The entire premise of the Company's argument is flawed. The argument rests on the unstated and erroneous assumption that the question of whether Bishop was engaged in protected activity is coterminous with the question of whether Nako actually had the right to bring a witness to her meeting with Bock.  These two questions are analytically distinct.  *See Briar Crest Nursing Home*, 333 N.L.R.B. 935, 947–48 (2001) (finding that an employee engaged in protected concerted activity by accompanying a colleague to a post-strike disciplinary meeting, without expressly finding that the colleague was entitled to have a witness at that meeting).  Bishop was engaged in protected activity when he confronted Bock, because he was acting on his reasonable belief that the Company was about to impermissibly discipline a bargaining unit employee. *Cf. Hi-Tech Cable Corp.*, 309 N.L.R.B. 3, 12 (1992) (finding that an employee was engaged in protected activity "when he . . . *honestly and reasonably* protested that [a] work assignment contravened an agreement reached in the preliminary stages of grievance resolution" (emphasis added)), *enforced* 25 F.3d 1044 (5th Cir. 1994) (unpublished).  It does not matter whether Bishop was correct in what he reasonably assumed.  *See Crown Zellerbach Corp.*, 284 N.L.R.B. 111, 112 (1987) (finding that an employee

was engaged in "protected concerted activity when he filed [a] grievance . . . even though as a temporary employee he probably was ineligible to file a grievance"). The point here is that when Bishop made repeated demands to represent Nako, he was merely acting as a "union steward" and a "forceful advocate for Nako." *Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 9. This was protected activity.

The Company next argues that even if Bishop was involved in protected activity when he intervened on Nako's behalf, he forfeited the Act's protections by confronting Bock in an opprobrious manner. *See, e.g.*, *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 837 (1984) ("An employee may engage in concerted activity in such an abusive manner that he loses the protection of § 7." (citations omitted)); *Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22, 26–29 (D.C. Cir. 2011) (discussing when conduct that is otherwise protected falls outside of the Act's protections, because it is "opprobrious"). We disagree. Whether an employee has "crossed that line depends on several factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." *Atl. Steel Co.*, 245 N.L.R.B. 814, 816 (1979). The Board followed this framework and found that Bishop's conduct "was [not] so egregious as to be considered indefensible." *Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 21. This finding is supported by substantial evidence, and the Company's claims to the contrary, *see* Pet'r's Br. at 34–37, are largely based on statements by discredited witnesses, *see Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 9; *see also id.* at 1 n.2.

The Company also argues that, in finding Bishop's dismissal to be an unfair labor practice, the Board ignored the fact that Bishop was a "recidivist" offender with a long disciplinary history. This is a specious argument. As the Company knew, Bishop was engaged in union activity on

October 18 when he attempted to assist Nako, by asking Bock if he intended to discipline her during a meeting. Substantial evidence in the record confirms that Nako had indicated that she wanted Bishop to accompany her to the meeting. "As a union steward, Bishop was fulfilling his union duties toward Nako in seeking to be present during what turned out to be a *Weingarten* investigative meeting." *Id.* at 20. The Board found that Bishop's conduct was protected and not opprobrious. The Company disciplined Bishop precisely because he was engaged in protected activity, not because of his alleged past bad behavior. We find no error in the Board's reasoning.

The Company next offers two arguments to challenge the Board's decision ordering reinstatement and backpay for Bishop. *First*, the Company seeks to avoid these remedies by pointing to its postdischarge discovery of *predischarge* misconduct that it claims would have justified Bishop's termination. Under Board precedent, "if an employer establishes that an employee engaged in misconduct for which the employer would have discharged any employee, reinstatement is not ordered and backpay is terminated on the date that the employer first acquired knowledge of the misconduct." *Berkshire Farm Ctr.*, 333 N.L.R.B. 367, 367 (2001) (citations omitted). Here, the Company claims that several months after Bishop was fired, Bock discovered that Bishop had failed to satisfy the Company's productivity standard for reporters. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 10.

The NLRB found that the Company's "'discovery' of Bishop's low productivity after his termination is a belatedly discovered pretext for Bishop's discharge." *Id.* at 21. This conclusion is supported by substantial evidence. The Company "closely monitored Bishop's story count from May 2002 to May 2004, resulting in warnings and a suspension." *Id.* Based on Bishop's disciplinary history, the NLRB reasonably rejected as implausible the Company's assertions that it was not monitoring

Bishop from "May 6, 2004, to October 27, 2005" and that it had "no idea of Bishop's productivity" during that window. *Id.* We owe substantial deference to the NLRB's factual inference that, given the circumstances, the Company must have been aware of Bishop's productivity throughout 2004 and 2005. Yet, the Company did not act to discipline Bishop for this alleged low productivity until many months after he had been fired. The Board reasonably concluded that the Company's productivity justification for firing Bishop was pretextual and unavailing. *See Citizens Inv. Servs. Corp.*, 430 F.3d at 1202 (rejecting an employer's proffered "affirmative defenses" for a disciplinary decision, in part, because "there was substantial evidence" that they were "pretextual").

*Second*, the Company claims that Bishop engaged in *postdischarge* disloyal conduct that precludes reinstatement and limits his right to backpay. The Company relies heavily on the Supreme Court's decision in *NLRB v. Local Union No. 1229, IBEW* ("*Jefferson Standard*"), 346 U.S. 464 (1953), in which the Court enforced an NLRB decision denying reinstatement to several discharged technicians, *see id.* at 465. As the Court explained, the technicians in question

> were discharged solely because, at a critical time in the initiation of the company's television service, they sponsored or distributed 5,000 handbills making a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income.

*Id.* at 471. The Court went on to hold that "[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer." *Id.* at 472.

The Company argues that it had cause to fire Bishop, because his postdischarge conduct was blatantly disloyal to the Company. In support of this claim, the Company points out that

Bishop stated at a public event that the Company suffered from organizational and management problems, *see Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 9, and that he made other disparaging statements about the Company on his blog, *see id.* at 9–10.

The ALJ found that, even under *Jefferson Standard*, an employee is entitled to reinstatement and backpay if his or her statements are not "maliciously false, *i.e.*, statements made with knowledge of their falsity or with reckless disregard for their truth or falsity." *Id.* at 22 (citing *TNT Logistics N. Am., Inc.*, 347 N.L.R.B. 568, 569 (2006)). According to the judge, Bishop's statements were not maliciously false. *See id.* The Board offered a different rationale to support the judgment that Bishop had not forfeited his reinstatement and backpay.

The NLRB held that *Jefferson Standard* is inapposite. *See id.* at 2–3. The Board noted that the technicians in *Jefferson Standard* verbally attacked the television company while they were current employees of that company. *See* 346 U.S. at 466–68. Bishop, in contrast, verbally attacked the Company after he was unlawfully discharged. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 9–10. The Board held that in the latter set of circumstances – *i.e.*, where an employer seeks to avoid its obligations based on an employee's postdischarge misconduct – the employer "has the burden of proving misconduct so flagrant as to render the employee unfit for further service, or a threat to efficiency in the plant." *Id.* at 2 (quoting *O'Daniel Oldsmobile, Inc.*, 179 N.L.R.B. at 405). The Board also overruled the "limited number of prior cases" in which it had "applied principles drawn from *Jefferson Standard* in evaluating whether postdischarge conduct disqualified unlawfully discharged employees from reinstatement and cut off their right to backpay." *Id.* (citations omitted).

Before this court, the Company objects to the Board's analysis on two levels. First, the Company argues that the

Board committed a legal error by adopting *O'Daniel Oldsmobile* as the governing standard when an employer challenges its remedial obligations based on an employee's postdischarge misconduct. *See* Pet'r's Br. at 65–69. In effect, the Company argues that the Board impermissibly moved the goalpost by jettisoning *Jefferson Standard* and resuscitating *O'Daniel Oldsmobile*. Second, the Company argues that, as a factual matter, the Board misapplied *O'Daniel Oldsmobile*. *See* Pet'r's Reply Br. at 19–20. The Company claims that even under *O'Daniel Oldsmobile*, Bishop is not entitled to reinstatement or backpay.

We lack jurisdiction to consider both arguments, however, because the Company never raised them before the Board. Section 10(e) of the NLRA states that "[n]o objection that has not been urged before the Board . . . shall be considered by" an appellate court absent "extraordinary circumstances." 29 U.S.C. § 160(e). And pursuant to section 10(e), a party's failure to present a question to the Board – including by failing to file a motion for reconsideration under the Board's regulations, *see* 29 C.F.R. § 102.48(d)(1) (2011) – "prevents consideration of the question by the courts." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982) (citation omitted); *see also Spectrum Health—Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 348 (D.C. Cir. 2011). The only argument that the Company advanced before the NLRB regarding Bishop's disloyalty is that Bishop does not qualify for reinstatement or full backpay under *Jefferson Standard*. That is the only argument that the Company preserved for appeal, and it does not encompass the Company's present objections to the Board's adoption or application of *O'Daniel Oldsmobile*.

The Company points to no extraordinary circumstances justifying its failure to raise and preserve the *O'Daniel Oldsmobile* arguments. To the contrary, the Company's arguments before this court – that the NLRB committed a legal error in changing the governing standard and committed a

factual error in applying that new standard – are precisely the types of claims that the Company was obligated to bring to the Board's attention by filing a motion for reconsideration. "Such a motion would have given the Board notice of [the Company's] objection[s] and an opportunity to fix its supposed mistake[s]." *W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008) (citations omitted). In the absence of such motion, we are constrained to find that the Company waived these arguments.

## E.  Smith's Making of a Secret Recording Was Protected

The Board found that the Company violated section 8(a)(3) and (1) by interrogating employees Sur, Smith, Loos, and Ing; suspending Sur and Smith; and discharging Smith. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 1. It therefore ordered the Company to offer to reinstate Smith, to compensate Smith and Sur for their lost earnings, and to remove any references to the challenged disciplinary actions in their respective files. *See id.* at 4.

According to the Board, these employees were engaged in protected concerted activity when they planned for Smith to record his meeting with Bock – and when Smith made the actual recording. The Board's finding is supported by substantial evidence, and it is consistent with controlling precedent. These employees reasonably believed that the Company was going to violate Smith's rights by refusing to allow him to bring a witness to an interview that would result in disciplinary action. And, as the Board found, it was reasonable for the employees to assume that Bock would not allow a witness to attend the meeting, because Bock had refused to allow Smith to serve as a witness during a similar meeting earlier that day. Under these circumstances, the employees' decision "to document what they perceived to be a potential violation of employee rights under *NLRB v. J. Weingarten*" qualified as protected activity. *Id.* at 1.

The Company offers three arguments to the contrary. *First*,

the Company claims that the employees were not engaged in protected activity, because Smith was not entitled to bring a witness to his meeting with Bock. According to the Company, Smith's mere belief that he was entitled to the presence of a witness was insufficient to trigger his rights under *Weingarten*, *see* 420 U.S. at 257 & n.5, and there has been no finding that Smith's belief was objectively reasonable. In fact, it appears that Smith may have been incorrect in assuming he was entitled to a witness, insofar as Bock had already determined the form of discipline to impose in that meeting. *See Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1142 (D.C. Cir. 2011) (explaining that "[l]ong ago" the NLRB "clarified" that an employee has no right to bring a witness to a meeting, the "sole purpose" of which is to deliver a predetermined warning). The Company also points out that the Union filed, but ultimately withdrew, charges alleging that the Company had committed *Weingarten* violations by denying Smith access to a witness during this meeting. *See* Third Amended Answer 2 nn. 1, 4, Oct. 15, 2007 (documenting withdrawal of charges), II J.A. 846. The Company thus contends that the Board erred in finding that Smith, Sur, Loos, and Ing were engaged in protected activity.

The Company's argument, again (as with its argument regarding Bishop), rests on an erroneous premise. These employees – like Bishop – were proactively responding to what they reasonably and honestly believed to be an imminent unfair labor practice. They were therefore engaged in protected activity. The Board correctly reached this finding without holding that the Company had committed *Weingarten* violations.

*Second*, the Company claims that Smith and his colleagues forfeited the Act's protections by engaging in unprotected activity. The NLRA "does not protect all concerted activities." *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17 (1962). Employees cannot claim the Act's protections when they engage in activities that are "unlawful, violent[,] . . . in breach of contract," *id.* (citations omitted), or otherwise "'indefensible,'"

*id.* (citation omitted). The Company urged the NLRB – and now urges this court – to conclude that the making of a secret audio recording is unprotected under this line of authority.

The Company concedes, as it must, that there was no then-existing company policy prohibiting Smith, Sur, Loos, and Ing from planning to make, or prohibiting Smith from making, a secret audio recording. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 15. The Company also concedes, as it must, that there was no state or local law prohibiting their conduct. *See* HAW. REV. STAT. § 803-42(b)(4). The Company thus cannot and does not claim that making the recording was unlawful, violent, or in breach of contract. Instead, the Company argues that the making of a secret audio recording is so fundamentally dishonest and deceitful that it should be deemed categorically unprotected. The Company's position is a bit perplexing in light of Company counsel's concession during oral argument that Smith would have committed no wrong had he memorized his conversation with Bock and then written it down verbatim after their meeting. In any event, the Company's argument fails, because it is foreclosed by established Board precedent.

In *Opryland Hotel*, 323 N.L.R.B. 723, 723 n.3 (1997), the Board expressly refused to adopt a *per se* rule against the making of secret audio recordings. Like the Company here, the respondent company in *Opryland Hotel* had "no rule, prohibition, or practice against employees using or possessing tape recorders at work." *Id.* (citations omitted). "And, in the absence of such rule, practice, or prohibition," the Board refused to hold that "such possession or use constitutes . . . *malum in se*." *Id.* The Board considered the circumstances of the case and ruled that the employee who had made the recordings was entitled to reinstatement "notwithstanding his secret tape recording of conversations at work." *Id.* In light of this directly controlling decision from the NLRB, it should be self-evident why we find unpersuasive the Company's nonbinding cases

holding that the making of secret audio recordings is not protected in *other* employment contexts. *See* Pet'r's Br. at 81–83.

The Board followed the appropriate, case-by-case approach adopted in *Opryland Hotel*. It found that, given the circumstances of this case, Sur, Smith, Loos, and Ing were engaged in protected concerted activity. That determination is reasonable, and, therefore, we must defer to it. An employer may, in different circumstances, have defensible reasons for barring secret recordings. We have no occasion to consider that question in this case. The policy here is invalid because the Company has conceded that it was promulgated solely in response to the employees' protected activity.

*Third*, the Company suggests that Smith and his colleagues should have pursued a different approach to protecting their asserted rights. The Company points out that even the Union administrator, Cahill, did not recommend that Smith record the meeting; he recommended that Smith take notes. *See Hawaii Tribune-Herald*, 356 N.L.R.B. No. 63, at 10. This argument is entirely unpersuasive. The fact that the employees failed to pursue other options certainly does not make their otherwise protected activity unprotected. As the Board found, the secret audio recording was neither prohibited by company policy, proscribed by state or local law, nor barred under the Board precedent.

### III. Conclusion

For the reasons given in the foregoing opinion, we deny the Company's petition for review and grant the Board's cross-application for enforcement.