**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner*,

v.

SIREN RETAIL CORPORATION
DBA STARBUCKS,

*Respondent*,

----------------------------------------

WORKERS UNITED,

*Intervenor*.

No. 22-1969

National Labor
Relations Board

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted December 6, 2023
Seattle, Washington

Filed April 24, 2024

Before: M. Margaret McKeown, N. Randy Smith, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Labor Law

The panel granted the National Labor Relations Board's application for enforcement of its order directing Starbucks Reserve Roastery in Seattle to "cease and desist from failing and refusing to recognize and bargain with the Union."

In February 2022, Workers United filed a petition seeking to represent 90 employees at the Seattle Roastery. Citing rising COVID-19 cases in the area, the Regional Director ordered a mail-ballot election, which took place in April 2022. Starbucks refused to recognize and bargain with the union, claiming that the Regional Director should have ordered an in-person election instead. The Regional Director overruled the objection and certified the results. The Board held that by refusing to recognize and bargain with the Union, Starbucks engaged in unfair labor practices in violation of Section 8(a)(5) of the National Labor Relations Act.

The panel rejected Starbucks's claim that the court lacked jurisdiction over the enforcement application because

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the Board severed the question of whether to adopt a compensatory remedy. The panel held that the Board's order was final and reviewable under 29 U.S.C. § 160(e). Nothing in the order suggested that the severed issue would have any effect on the Board's conclusion regarding the underlying charge, nor on the order to bargain.

The panel held that the Regional Director did not abuse his discretion when he faithfully applied *Aspirus Keweenaw*, 370 N.L.R.B. 45 (2020), and ordered a mail-ballot election. Accordingly, the panel held that the Board correctly applied its own law in determining that the Regional Director appropriately exercised its discretion to hold a mail-ballot election. The certification of the union's representative was proper, and the Board correctly found that Starbucks violated Section 8(a)(5) by refusing to bargain.

## COUNSEL

Michael R. Hickson (argued), Senior Attorney; Elizabeth A. Heaney, Supervisory Attorney; David Habenstreit, Assistant General Counsel; Ruth E. Burdick, Deputy Associate General Counsel; Peter S. Ohr, Deputy General Counsel; Jennifer A. Abruzzo, General Counsel; National Labor Relations Board, Washington, D.C.; for Petitioner National Labor Relations Board.

Benjamin Berger (argued) and Dmitri Iglitzin, Barnard Iglitzin & Lavitt LLP, Seattle, WA, for Intervenor Workers United.

Gregory S. Fisher (argued), Littler Mendelson PC, Anchorage, Alaska; Ryan P. Hammond, Littler Mendelson

PC, Seattle, Washington; Maury Baskin and Stefan Marculewicz, Littler Mendelson PC, Washington, D.C.; for Respondent Siren Retail Corporation dba Starbucks.

---

## OPINION

McKEOWN, Circuit Judge:

Starbucks's strained relationship with its unionized workers has been much in the news over the past few years. This case, which concerns a prolonged battle over the union election at the first Starbucks Reserve Roastery in Seattle, is no exception.

In February 2022, Workers United filed a petition seeking to represent 90 employees at the Seattle Roastery. Citing rising COVID-19 cases in the area, the Regional Director ordered a mail-ballot election, which took place in April 2022. Starbucks refused to recognize and bargain with the union, claiming that the Regional Director should have ordered an in-person election instead. The Board disagreed, ordering Starbucks to "cease and desist from failing and refusing to recognize and bargain with the Union," while severing the issue of whether the Board would order an additional compensatory remedy for the lost opportunity to bargain. This application for enforcement followed.

We initially address Starbucks's claim that we lack jurisdiction over the application because the Board severed a remedial issue; we then consider whether the Regional Director abused his discretion by ordering a mail-ballot election, rather than a manual election. Because we have jurisdiction, and because the Regional Director properly

exercised his discretion to order a mail-ballot election, we grant the Board's application for enforcement.

## I. BACKGROUND

Following the filing of the representation petition, Workers United and Starbucks stipulated to most details regarding the union election. The major point of contention was that Workers United requested a mail-ballot election while Starbucks requested a manual election. On March 17, 2022, the Regional Director issued his opinion, ordering a mail-ballot election because the 14-day trend in the number of new confirmed COVID-19 cases in King County, Washington—where the Roastery is located—was increasing. Specifically, the opinion explains that "[a]s of March 16, the Johns Hopkins University & Medicine Coronavirus Resource Center reports a -14 day case count in King County of 663 cases and a -2 day case count, the most recent report, of 742 cases, an increase."

Starbucks requested Board review of the Regional Director's conclusion, arguing that he misapplied *Aspirus Keweenaw*, a key Board decision involving COVID-19 and election protocols. *Aspirus Keweenaw*, 370 N.L.R.B. 45 (2020), 2020 WL 6594972. In a 2–1 decision, the Board denied the request. *See Siren Retail Corp.*, No. 19-RC-290608, 2022 WL 1002006, at *1 (Apr. 1, 2022). Chairman McFerran noted that she would hold that the Regional Director did not abuse his discretion "for the reasons given in her separate opinion[1] in *Aspirus*," but "even under the majority opinion in *Aspirus*, the Regional Director's

---

[1] Chairman McFerran's "separate opinion" in *Aspirus* was a concurring opinion which argued that the Board should abandon the general rule that elections should be conducted manually. *Aspirus*, 2020 WL 6594972, at *13–15.

decision should be affirmed based on the increasing 14-day trend in the number of new Covid-19 cases in King County." *Siren*, 2022 WL 1002006, at *1 n.1. Member Kaplan dissented, noting that because the Regional Director compared "two data points" instead of accounting for the "14-day trend as required by *Aspirus*," he would have granted Starbucks's request. *Id.*

The mail-ballot election was conducted on April 21, 2022. Out of 104 eligible voters, 69 ballots were returned, for a participation rate of 66 percent. The union won the election by a margin of 11 ballots. Starbucks objected to the election, but the Regional Director overruled the objection and certified the results. As is common in cases where the employer seeks to test election certification,[2] Starbucks refused to bargain with the Union, and the General Counsel filed a complaint alleging unfair labor practices.

In November 2022,[3] the Board held that by refusing to recognize and bargain with the Union, Starbucks engaged in unfair labor practices in violation of Section 8(a)(5) of the National Labor Relations Act. In the "Remedy" section of

---

[2] This procedural posture results because election certification decisions are not final orders under Section 10(e) or 10(f) of the NLRA, and thus are not directly reviewable. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 476–78 (1964); *NLRB v. Belcor, Inc.*, 652 F.2d 856, 858 n.2 (9th Cir. 1981).

[3] In the interim, in September 2022, the Board decided *Starbucks Corp. & Workers United, Petitioner*, 371 N.L.R.B. 154 (2022), 2022 WL 4598534. *Starbucks Corp.* amended the standard laid out in *Aspirus* to abandon reliance on COVID-19 positivity rates, instead adopting the CDC's Community Level metric for determining COVID-19 risk. *Id.* at *2–4. However, because the Board found that applying *Starbucks Corp.* retroactively in pending cases like this one "would work a manifest injustice," it declined to do so. *Id.* at *6.

the decision, the Board ordered "[Starbucks] to cease and desist from failing and refusing to recognize and bargain with the Union, to bargain on request with the Union and, if an understanding is reached, to embody the understanding in a signed agreement."  The Board noted that "the General Counsel request[ed] that [the Board] adopt a compensatory remedy requiring [Starbucks] to make its employees whole for the lost opportunity to bargain at the time and in the manner contemplated by the Act."  However, because "[t]o do so would require overruling *Ex-Cell-O Corp.*, 185 N.L.R.B. 107 (1970)," which held, more than fifty years ago, that such make-whole remedies were beyond the Board's statutory authority, the Board "decided to sever this issue and retain it for further consideration to expedite the issuance of this decision regarding the remaining issues in this case."  This application for enforcement is before us for review.

## II. DISCUSSION

### A.  Jurisdiction

We first consider whether we lack jurisdiction to resolve the Board's application for enforcement under 29 U.S.C. § 160(e), because the Board severed the question of whether to adopt a compensatory remedy.  We review this question de novo and conclude that we have jurisdiction.  *See Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022).

Under Section 10(e) of the National Labor Relations Act, "[t]he Board shall have power to petition any court of appeals of the United States . . . for the enforcement of [its] order[s]," including "order[s] requiring [a] person to cease and desist from [an] unfair labor practice."  29 U.S.C.

§§ 160(c), (e).[4]  Although Section 10(e) does not explicitly limit appellate review of petitions for enforcement to "final" Board orders, we have long held that only such orders are reviewable.  *See NLRB. v. Cal. Horse Racing Bd.*, 940 F.2d 536, 539 (9th Cir. 1991) (stating that "sections 10(e) and (f) of the NLRA . . . provide for [judicial] review only upon petition for enforcement of, or appeal from, final Board orders").

As in other contexts where administrative finality is at issue, we apply the Supreme Court's test from *Bennett v. Spear*, 520 U.S. 154 (1997).  *See, e.g.*, *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022) (applying *Bennett* to the question of whether an order is "final" under the Exchange Act, noting that "we have previously held that the *Bennett* test may govern the meaning of the word 'final' for other analytically equivalent federal jurisdictional statutes outside the APA"); *see also United Nat. Foods, Inc. v. NLRB*, 66 F.4th 536, 540–42 (5th Cir. 2023) (applying the *Bennett* standard to a petition for review under Section 10(f) of the NLRA); *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1249 (D.C. Cir. 2012) (applying the *Bennett* standard to cross-petitions for enforcement and review under Section 10(e) and 10(f)).

Under *Bennett*, for an agency action to be "final" and thus reviewable, it "must mark the consummation of the agency's decisionmaking process—it must not be of a

---

[4] The NLRA also allows "[a]ny person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals . . . by filing in such a court a written petition praying that the order of the Board be modified or set aside."  29 U.S.C. § 160(f).  No such petition was filed in this case.

merely tentative or interlocutory nature." 520 U.S. at 177–78 (cleaned up). Additionally, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (cleaned up). "In applying this test, we look to factors such as whether the action 'amounts to a definitive statement of the agency's position,' whether it 'has a direct and immediate effect on the day-to-day operations' of the subject party, and if 'immediate compliance [with the terms] is expected.'" *Saliba*, 47 F.4th at 967 (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)).

Applying the *Bennett* standard in a "pragmatic and flexible manner," we have no difficulty concluding that the Board's order is final and reviewable under 29 U.S.C § 160(e). *See id.* ("[T]he finality element must be interpreted in a pragmatic and flexible manner." (quoting *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995))). The order marks the "consummation" of the Board's process regarding the unfair labor practice charge against Starbucks, "from which legal consequences will flow," *Bennett*, 520 U.S. at 177–78, because it requires Starbucks to bargain with Workers United "as the exclusive collective-bargaining representative of the employees in the bargaining unit." Nothing in the order suggests that the severed issue—whether the Board should overrule longstanding precedent disallowing make-whole remedies—would have any effect on the Board's conclusion regarding the underlying charge, nor on the order to bargain. Applying the *Bennett* standard in a "pragmatic and flexible manner," *Saliba*, 47 F.4th at 967, we see no reason to conclude that severing the *Ex-Cell-O* issue from the other issues in the case renders the Board's decision nonfinal. The General Counsel requested the compensatory remedy as an additional remedy. That remedy

is not linked—inextricably or otherwise—with the order "to recognize and bargain with the Union."

The D.C. Circuit, the only other court to address whether severing the *Ex-Cell-O* issue from an NLRB enforcement order renders the agency's action nonfinal, made short work of the issue: "That the Board severed a remedial issue for future consideration does not affect our jurisdiction to consider Longmont's petition for review and adjudicate issues that the Board has resolved." *Longmont United Hosp. v. NLRB*, 70 F.4th 573, 578 (D.C. Cir. 2023) (citing *Stephens Media*, 677 F.3d at 1250). [5]  Although the parties in *Longmont* did not dispute the jurisdictional question—as Starbucks correctly observes—that posture did not relieve the court of its duty to assure itself of its subject-matter jurisdiction before proceeding to the merits.  *See, e.g.*, *United States v. McIntosh*, 833 F.3d 1163, 1170 (9th Cir. 2016); *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).

Our approach also mirrors other cases where we have enforced a Board decision even when it severs or reserves judgment on a separate issue. *See, e.g.*, *NLRB v. McMahon*, 428 F.2d 1213, 1214 (9th Cir. 1970) (enforcing the Board's decision although the issue of whether and to what extent the wrongfully discharged employee was entitled to backpay remained; we noted that "[t]he backpay questions will be considered during compliance proceedings"); *Great Chinese Am. Sewing Co. v. NLRB*, 578 F.2d 251, 255–56 (9th Cir.

---

[5] The Board has severed the *Ex-Cell-O* issue from several cases since *Longmont*, including this one.  The only other such case in this circuit, *NLRB v. Oakrheem Inc.*, was resolved without reference to the jurisdictional issue raised here.  *NLRB v. Oakrheem, Inc.*, Nos. 23-47, 23-77, 2023 WL 8621974 (9th Cir. Dec. 13, 2023).

1978) (same); *NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 600 F.2d 770, 778–79 (9th Cir. 1979) (enforcing a Board decision that reserved the issue of the identity of the discriminatees, and holding that "the Board acted in its discretion in reserving the issue until after enforcement").

On the other side of the ledger, the case law Starbucks analogizes to is inapposite. Starbucks argues that "[i]f a decision leaves substantive issues unresolved" then jurisdiction is not available under Section 10(e), primarily relying on *Iron Workers*. But *Iron Workers* says nothing of the sort. In fact, the case acknowledges that "the Board has typically taken a two-step approach" to backpay claims by determining "whether an unfair labor practice has occurred and whether backpay should be ordered" at the first step and "the specifics of compliance" at the second step. 600 F.2d at 778–79. In doing so, we observed that "[o]ften the only issue for resolution at a compliance proceeding following a backpay order is the computation of the amount to be awarded." *Id.* *Iron Workers* does not address whether a court has jurisdiction over an enforcement decision where the propriety of a particular remedy has been severed for a later decision.

At bottom, Starbucks confuses the cosmic importance of the severed issue with the finality of the unsevered decision. Whether overruling *Ex-Cell-O* "represents a drastic and ground-breaking departure from long-settled Board precedent," as Starbucks posits, the Board's decision conclusively determined that Starbucks committed unfair labor practices under Section 8(a)(5) and ordered a final remedy—namely, that Starbucks "cease and desist from failing and refusing to recognize and bargain with the Union." Whether the Board may overrule *Ex-Cell-O* and

order an additional make-whole remedy for Starbucks's refusal to bargain does not negate the reality that the decision "consummat[es]" the Board's final statement on the underlying violation and is one "from which legal consequences"—the requirement to bargain with the Union—"will flow" if enforced. *Bennett*, 520 U.S. at 177–78.

Accordingly, we have jurisdiction under 29 U.S.C. § 160(e) and proceed to the merits of the Board's application for enforcement.

**B.  The Mail-Ballot Election**

We next consider whether the Regional Director abused his discretion when he applied *Aspirus Keweenaw*, 370 N.L.R.B. 45 (2020), and ordered a mail-ballot election. Because the Regional Director and the Board faithfully applied *Aspirus*, Starbucks's abuse of discretion challenge fails.[6]

Our standard of review is well settled. We will enforce an order of the Board if it "correctly applied the law and if its factual findings are supported by substantial evidence in the record as a whole." *Int'l Longshore & Warehouse Union v. NLRB*, 978 F.3d 625, 633 (9th Cir. 2020) (quoting *Plaza Auto Ctr., Inc. v. NLRB*, 664 F.3d 286, 291 (9th Cir. 2011)). "While we accord the Board's interpretations of the NLRA considerable deference, its legal interpretations must follow Supreme Court and circuit case law, and absent explanation,

---

[6] We do not need to address Starbucks's passing reference in its brief to a whistleblower complaint and Member Wilcox's failure to recuse herself. Starbucks waived these issues because it failed to specifically and distinctly argue them in its opening brief. *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986).

adhere to its own precedent." *Id.* (cleaned up). "Substantial evidence supports a factual finding if a reasonable juror could have reached the Board's conclusion." *Id.*

The Supreme Court has long recognized that the Board has "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946). The Board has historically delegated "a portion of this authority to the Regional Directors who have discretion to determine election arrangements, including whether the election should be conducted manually or by mail ballot." *Cast N. Am. (Trucking) Ltd. v. NLRB*, 207 F.3d 994, 999 (7th Cir. 2000) (citing *San Diego Gas & Elec.*, 325 N.L.R.B. 1143 (1998)); *see also Kwik Care Ltd. v. NLRB*, 82 F.3d 1122, 1126 (D.C. Cir. 1996) ("As a general matter, the Board enjoys broad discretion in its administration of representation elections, and the party challenging the Board-certified results of an election carries a heavy burden.").[7] Two cases that frame the boundaries of this discretion, *San Diego Gas* and *Aspirus Keweenaw*, are at the heart of this dispute.

---

[7] Starbucks contends that we owe no deference to the Board's exercise of discretion here because "the majority did not meaningfully explain its reasoning," and "the Board has no agency experience or expertise in disease control, healthcare policy, or epidemiology." Even a cursory reading of the decision reveals that the Regional Director explained his reasoning and application of *Aspirus*. Nothing required the Board or Regional Director to have expertise in public health or epidemiology in order to review data that may impact a union election. Starbucks cites no authority that would allow us to override the Board's "broad discretion in its administration of representation elections," *Kwik Care*, 82 F.3d at 1126, especially when the Board was required to adapt its policies and procedures to an unprecedented public health emergency.

In *San Diego Gas*, the Board "adhere[d]" to the "general rule [that representation elections] be conducted manually," but it also recognized "that there are instances where the Regional Director, because of circumstances that would tend to make it difficult for eligible employees to vote in a manual election, may reasonably conclude that conducting the election by mail ballot . . . would enhance the opportunities for all to vote." *San Diego Gas*, 325 N.L.R.B. at 1144. *San Diego Gas* outlined some such "instances," such as where voters are "scattered" (either geographically or because their schedules vary widely) or where there is a strike in progress. *Id.* at 1145. But the Board "recognize[d] that there may be other relevant factors that the Regional Director may consider in making this decision" under "extraordinary circumstances." *Id.*

In *Aspirus Keweenaw*, the Board addressed the application of *San Diego Gas* a to a new "extraordinary circumstance[]"—the COVID-19 pandemic. *Aspirus* set forth six factors, any one of which "will normally suggest the propriety of using mail ballots under the extraordinary circumstances presented by this pandemic." *Aspirus*, 2020 WL 6594972, at \*6. Only one factor is at issue in this appeal: Whether "the 14-day trend in the number of new confirmed cases of Covid-19 in the county where the facility is located is increasing, or the 14-day testing positivity rate in the county where the facility is located is 5 percent or higher." *Id.* at \*7.[8] *Aspirus* noted that it focused on the "14-day trend

---

[8] The other factors include: (1) whether "[t]he Agency office tasked with conducting the election is operating under 'mandatory telework' status"; (2) whether "[t]he proposed manual election site cannot be established in a way that avoids violating mandatory state or local health orders relating to maximum gathering size"; (3) whether "[t]he employer fails or refuses to commit to abide by the GC Memo 20-10 protocols";

in the number of new confirmed Covid-19 cases" because President Trump's "Guidelines for Opening Up America Again" used that metric to ascertain whether COVID-19 conditions in a given area were "improving, deteriorating, or remaining stable." *Id.* at *8. Under *Aspirus*, Regional Directors were to access county-level data via Johns Hopkins University's Coronavirus Resource Center, and if the Regional Director based the decision on a different geographic measure or different data source, the Director was to "articulate the basis for relying on that measure." *Id.* at *8–9 & n. 22. Other than the guidance that "Regional Directors should include in their decision the most recent available county-level data regarding the 14-day trend," and that "the 14-day period should be measured from the date of the Regional Director's determination, or as close to that date as available data allow," *Aspirus* offers no further instruction as to the manner in which the "14-day trend" should be calculated. *Id.* at *7–8 & n.20.

Applying *Aspirus* in this case, the Regional Director reviewed the then-available data via the Johns Hopkins Coronavirus Resource Center and concluded that it "report[ed] a -14 day case count in King County of 663 cases and a -2 day case count, the most recent report, of 742 cases, an increase."

Starbucks contends that the Regional Director misapplied *Aspirus* because *Aspirus* required a 14-day rolling average rather than "focusing on a 2-day spike in cases." But Starbucks fails to put forth sufficient evidence

---

(4) whether "[t]here is a current Covid-19 outbreak at the facility or the employer refuses to disclose and certify its current status"; and (5) "[o]ther similarly compelling considerations." *Aspirus*, 2020 WL 6594972, at *6–11.

to undermine the Regional Director's application of *Aspirus* or his conclusion that the 14-day trend in COVID cases was increasing.

The fundamental problem with Starbucks's argument is that *Aspirus* does not actually define what a "14-day trend" consists of or how a Regional Director should calculate it. *Aspirus* references three components with respect to this factor: (1) use of the Johns Hopkins data; (2) consultation of "the most recent available county-level data regarding the 14-day trend," and (3) measurement of "the 14-day period . . . from the date of the Regional Director's determination, or as close to that date as available data allow." *Aspirus*, 2020 WL 6594972, at *7–8 & n.20, n.22. Even so, the Board made clear that Regional Directors are given discretion with respect to the choice of data, and the Board does not mandate a particular type of statistical analysis for calculating the "14-day trend." *Id.* Because "the Board . . . has delegated to the Regional Directors discretion over the arrangements for an election, including whether it should be conducted by manual balloting or mail ballot," we do not accept Starbucks's invitation to assume that *Aspirus* mandated a particular calculation when it did not say so. *Id.* at *3.

Further, Starbucks has not demonstrated that the Regional Director improperly ordered a mail-ballot election based on the data available to him at the time of his decision, which *Aspirus* required him to consult. Throughout its briefing, Starbucks relies upon data from March 18 and March 21 to show that the 14-day rolling average was decreasing, but neither of these case counts would have been accessible to the Regional Director on March 17, when he issued the order. Starbucks faces the same issue when it claims that the Regional Director should have used the

county-level data directly from the King County Department of Health, discussing data posted as late as March 21.

Even if we credit Starbucks's approach, which provides a different lens for analysis, our standard of review does not permit us to "displace the NLRB's choice between two fairly conflicting views." *Walnut Creek Honda Assocs. 2, Inc. v. NLRB*, 89 F.3d 645, 648 (9th Cir. 1996) (quoting *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 (9th Cir. 1995)). "[T]he party challenging the Board-certified results of an election carries a heavy burden," *Kwik Care*, 82 F.3d at 1126, and Starbucks has failed to carry that burden here.

We hold that the Board correctly applied its own law in determining that the Regional Director appropriately exercised his discretion to hold a mail-ballot election. Thus, the certification of the union's representative was proper, and the Board correctly found that Starbucks violated Section 8(a)(5) by refusing to bargain.

**APPLICATION      FOR      ENFORCEMENT GRANTED.**